# Exhibit 1

The following is the PDF of an official transcript.  Official transcripts may be filed in CM/ECF only by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3

4
   KEIONTAY DAVIS,                  )
5                                   )
                                    )
6              Plaintiff,           )
          v.                        )  CIVIL ACTION
                                    )  FILE NO. 1:22-CV-01692-VMC
7   WINGATE MANAGEMENT COMPANY,     )  through 1:22-CV-01696-VMC
    LLC,                            )
8                                   )
              Defendant.            )  MOTION HEARING
9  _____ )

10

11  ---------------------------------------------------------

12        BEFORE THE HONORABLE VICTORIA M. CALVERT

13            TRANSCRIPT OF PROCEEDINGS

14                  MAY 20, 2025

15

    ---------------------------------------------------------
16

17

18      Proceedings recorded by mechanical stenography
          and computer-aided transcript produced by
19
              WYNETTE C. BLATHERS, RMR, CRR
20                Official Court Reporter
                  2114 U.S. Courthouse
21               75 Ted Turner Drive, SW
                 Atlanta, Georgia  30303
22                  (404) 215-1547

23

24

25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:          DAVID H. BOUCHARD
                                 OTO U. EKPO
 3                               Attorneys at Law
                                 Finch McCranie, LLP
 4                               229 Peachtree Street NE
                                 Suite 2500, International Tower
 5                               Atlanta, Georgia  30303

 6                               THOMAS E. REYNOLDS, JR.
                                 Attorney at Law
 7                               Reynolds Law Group, LLC
                                 3390 Peachtree Road
 8                               Suite 1100
                                 Atlanta, Georgia  30326
 9
     For the Defendant:          LAUREN D. WOODRICK
10                               DOUGLAS L. CLAYTON
                                 Attorneys at Law
11                               Marsh Atkinson & Brantley
                                 271 17th Street NW
12                               Suite 1600
                                 Atlanta, Georgia  30363
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    Tuesday Morning Session

2                       May 20, 2025

3                       10:05 a.m.

4                        -  -  -

5                P R O C E E D I N G S

6          COURTROOM SECURITY OFFICER:  All rise.  The Honorable

7  United States District Court for the Northern District of

8  Georgia, Atlanta Division, is now in session, the Honorable

9  Judge Victoria Marie Calvert presiding.

10         THE COURT:  Good morning.  Please be seated.  Good

11 morning, everyone.  We're here for oral argument in several of

12 these cases.  The first is Davis v. Wingate Management

13 Company, LLC, Case No. 1:22-CV-1692, and they go until

14 1:22-CV-1696.  Can I have appearances on behalf of the

15 plaintiffs.

16         MR. BOUCHARD:  Good morning, your Honor.  David

17 Bouchard from the law firm Finch McCranie here in Atlanta,

18 Georgia on behalf of the plaintiffs.  I'm joined by my

19 co-counsel, Oto Ekpo, who will be filing a notice of

20 appearance in these cases.

21         THE COURT:  All right.  Good morning to both of you.

22         MS. EKPO:  Good morning.

23         MR. BOUCHARD:  Thank you.

24         MR. CLAYTON:  Good morning, your Honor.  Lee Clayton

25 and Lauren Woodrick on behalf of the defendant.
```

```
1           THE COURT:  Good morning to both of you.

2           MS. WOODRICK:  Good morning, your Honor.

3           THE COURT:  Have you all discussed how you want to

4  proceed?  Did defendant want to start?

5           MR. CLAYTON:  We certainly can, your Honor.

6  Obviously, we have five cases.  There's some issues that

7  overlap.  There's some issues that are, you know, personal

8  knowledge and certain issues that are by defendant, so one --

9  excuse me -- by plaintiff.

10          So the first, I guess, obviously we can go first, but

11 if your Honor has any questions about anything or wants us to

12 specifically address anything in particular, we'd be happy to

13 know that because it may be that Ms. Woodrick addresses it or

14 I address it depending on what it is because we kind of split

15 up some of the things.  But if you don't have any questions,

16 then I can just jump in and then let Ms. Woodrick go in a

17 minute.

18          THE COURT:  So the couple of questions that I have

19 are, just to make sure I'm clear on your position, that all of

20 the plaintiffs are either licensees or trespassers?  That's

21 one question.  And then the other question is whether your

22 position is that all of the plaintiffs have the same knowledge

23 of the dangerous condition or do you think there are different

24 considerations there?

25          MR. CLAYTON:  So, your Honor -- I apologize.  Were
```

1 | you going to say anything else?

2 |       THE COURT:  No, it seemed like because you had a

3 | division of arguments --

4 |       MR. CLAYTON:  Those are -- I believe we can answer --

5 | Ms. Woodrick can answer your question.  No, they do not have

6 | all the same knowledge, and she can tell you why.  And she can

7 | also get into the licensing and trespassers, so I will let her

8 | get into that.

9 |       THE COURT:  Okay.

10 |       MS. WOODRICK:  Good morning, your Honor.  It is

11 | defendant's position that all of the plaintiffs are either

12 | licensees or trespassers, but there are different facts that

13 | apply to each of them that inform that analysis.  And I'll

14 | start with the trespassers.  Defendants contend that two of

15 | the cases involve trespassers.

16 |       THE COURT:  And your position is that they're

17 | trespassers because they were trespassing in the past?

18 |       MS. WOODRICK:  Yes.  They were arrested for criminal

19 | trespass on the premises.

20 |       THE COURT:  Then do you ever stop being a trespasser?

21 |       MS. WOODRICK:  The statutes and the rules that apply

22 | to that do not have a deadline as to when you are no longer a

23 | trespasser.

24 |       Mr. Long in particular had originally been criminally

25 | trespassed from the property in 2013.  His 2020 arrest for

1  criminal trespass was based on the officer's knowledge of his
2  prior criminal trespass, so it was APD's position that that
3  criminal trespass from 2013 continued seven years.
4       Mr. Newton, the other trespasser who had been
5  arrested for criminally trespassing, had been criminally
6  trespassed from the property in 2016 in a pretty, from what I
7  understand from talking with Officer Jackson who provided a
8  declaration, a pretty memorable arrest where he had thrown a
9  firearm on top of the building, and I believe he served some
10 prison time after that.
11      So it would be our position that those criminal
12 trespass warnings did not expire, and certainly the lease
13 documents that Wingate gave their tenants provided that they
14 could exclude people from the property who they found
15 undesirable.  These gentlemen were arrested on or near the
16 property multiple times for drugs, for firearms, so that
17 judgment call of what is undesirable, I think, would be
18 supported by the record in that case.
19      THE COURT:  Well, did Wingate have to follow a
20 particular procedure to exclude the undesirables?
21      MS. WOODRICK:  So I think that to issue the initial
22 criminal trespass warning, someone from the property would
23 issue that, a manager or the security consultant, and once
24 that is issued, then APD can enforce that criminal trespass
25 warning and arrest on that criminal trespass warning.  And in

 1  both cases of Mr. Long and Mr. Newton, they were both arrested

 2  by APD for trespassing.

 3          THE COURT:  Okay.  So those are the trespassers?

 4          MS. WOODRICK:  Yes.  And we would further contend

 5  that even if they weren't trespassers, the licensee analysis

 6  and the facts that go along with that are fairly similar for

 7  each one of the plaintiffs in that they were loitering on the

 8  property.  There were signs on the property.  There were

 9  provisions in the lease documents that did not allow loitering

10  for tenants' guests, for anyone to do that.

11          THE COURT:  What does loiter -- how are you defining

12  loitering?

13          MS. WOODRICK:  Well, in this case we have video.

14  They were milling about on the property.  They were walking

15  in, walking out, talking to each other.  It was, I think,

16  their testimony that they were standing talking to each other

17  on the property in the grassy area.  There are also lease

18  provisions that disallowed standing in the grassy area even.

19  They're supposed to traverse on the walkways, get to where

20  they're going, and go there to whatever unit they're going to.

21          I will say that there are certain facts for each one

22  of these, each one of these plaintiffs that discount their

23  position that they were invitees.  And that is related to the

24  unique configuration of this housing community in that it is

25  scattered between buildings that are not owned and operated by

1   Wingate.  There are commercial buildings.  There are parks.

2   There are city streets and sidewalks that separate these

3   buildings.

4          It would be our position certainly that Mr. Newton

5   was on a purely personal mission.  He was visiting a friend

6   who lived half a mile away, and he had left that apartment

7   building to go to, I think, a Zaxby's.  And ultimately the

8   Zaxby's was closed, or for whatever reason he could not go

9   there and happened to come back the other way, see some

10  friends, eat something, and then continue to hang out at this

11  place that was half a mile from where he was invited.

12         There were several commercial buildings, residential

13  buildings, homes in between the place where he was invited to

14  and the place where he was at the time of this shooting.

15  There was no shared parking with that building.  There was no

16  shared ingress/egress with that building.

17         Mr. Davis is somewhat similar to that in that he was

18  invited or claims that he was invited to a building that was

19  on the same block, but it did not share parking, did not share

20  entrance, did not share walkways.  There was no reason to go

21  through that area of the premises in order to get to the place

22  where he was invited, so that is another similarity.

23         Mr. Sims, it is claimed that he was invited by

24  Tommaneka Woods.  The testimony and the evidence on that, I

25  think, is a little bit contradictory.  Mr. Long's initial

1   testimony was that he had told Mr. Sims to meet him there to

2   go somewhere else, and he ultimately never went to Ms. Woods'

3   apartment unit.

4          In his case -- in all of their cases they were on a

5   personal mission at the time.  They were not accompanied by

6   any tenants.  They were not going into the building.  They

7   were not traversing through there to go into a unit to visit

8   anyone, and they certainly did not have any rights to just

9   hang out on the property in front of the building and

10   certainly not in the grassy area because the tenants who did

11   live in those buildings didn't have rights to do that under

12   their lease documents.

13          THE COURT:  Why isn't that a fact dispute that a jury

14   should figure out?

15          MS. WOODRICK:  We would contend that it isn't.  We

16   would contend that that is -- that it is undisputed that they

17   were not visiting a tenant at the time.  We have video proof

18   of that, that they were not visiting a tenant at the time.

19   They were not accompanied by a tenant at the time.  That is

20   undisputed.  It's undisputed that they were walking around in

21   a common area which would meet our definition of loitering.

22          The building -- it's undisputed that the building had

23   signs that said no loitering.  It's undisputed that the lease

24   documents did not allow loitering, even of the tenants.  It is

25   undisputed where -- who had invited them to the building.

1          So we would contend that those facts that support the
2     licensee or trespasser status are undisputed.
3          THE COURT:  Does it matter at all whether a plaintiff
4     was an intended target versus a bystander?
5          MS. WOODRICK:  For purposes of the duty owed to them?
6          THE COURT:  Or -- yes or maybe even other, I guess,
7     other things you raise later on.
8          MS. WOODRICK:  I think that for our purposes or our
9     legal analysis, that is a question that Mr. Clayton will
10    address in the foreseeability of drive-by shootings in general
11    and the applicability of the *Hillcrest* case in this case.
12         THE COURT:  All right.
13         MS. WOODRICK:  I can also address their knowledge or
14    if there's anything else you would like for me to address with
15    respect to the duty owed.
16         THE COURT:  I think I'm good for right now on that.
17    Thank you.
18         MS. WOODRICK:  Yes, your Honor.  With respect to
19    equal knowledge or in some cases we would contend superior
20    knowledge, each of the plaintiffs have knowledge of the crime
21    in the area.  They have knowledge of violent crime in the
22    area.  They have knowledge of this block in particular and
23    have spent -- had spent a lot of time there, but there are
24    individual facts that inform that analysis for each one of
25    those plaintiffs.

```
 1          I would like to start with the decedent in this case,
 2   Mr. Sims.  Mr. Sims was shot in the chest in a drive-by
 3   shooting at this same location on June 27th of 2019, same time
 4   of year, same -- I believe it was 3:00 o'clock in the morning,
 5   so it was also at night.  It was the same location.  He had --
 6   and we see this analysis a lot in slip and fall and similar
 7   type of cases where if you have traversed the same hazard
 8   successfully or unsuccessfully, then you have knowledge of it.
 9   And, honestly, I cannot think of a scenario in third-party
10   criminal acts that would give you more knowledge than having
11   experienced that exact thing at that exact time of day, time
12   of year, location.
13          In addition to that, he spent most nights on that
14   block.  He had grown up there in the area.  He'd never been a
15   Bedford Pines resident, but he had grown up in that area, had
16   close friends who had lived there, and had spent a lot of his
17   time there.
18          I'm sure that plaintiffs will tell you that there was
19   a lot of crime that happened in that radius around there.
20   There were a lot of shootings that happened on that block, and
21   that supports their position as to foreseeability.  But even
22   their own expert said that if it was foreseeable to Wingate,
23   it would have been foreseeable to these plaintiffs.  And that
24   in and of itself is dispositive on the premises liability
25   issue.
```

1       Mr. Long similarly had been injured in a drive-by

2  shooting on the neighboring block, I think, three years before

3  that.  His very close friend had been shot and killed at a gas

4  station on that block in 2019.  He testified that police were

5  always there because that's where the crime was.  He had grown

6  up there.  He had been there all his life, and he knew that it

7  was a dangerous environment, was essentially his testimony on

8  that.

9       Mr. Newton also went to this particular block every

10  other day for about five years, and it was the testimony of

11  one witness that she saw him there every day in May and June

12  of 2020.  So at the very time of this happening, he was there

13  every day.  As evidenced by the arrest we talked about

14  earlier, he had guns when he came to the area, and he had

15  several arrests, convictions that involved actions that

16  happened in that area.  So his awareness of the crime and the

17  danger that might come with that gun violence in particular he

18  was aware of.

19       Mr. Phillips also spent a lot of time on this block.

20  He essentially testified that he lived there had off and on

21  from 2018 to 2022, and, again, was seen almost every night in

22  May and June of 2020 on this very block.  He testified that he

23  knew the environment was dangerous, and he also had a history

24  of drug arrests and convictions.  And the violence that is

25  attendant to that, he certainly had awareness of that.

1          Finally, Mr. Davis had lived at a Bedford Pines

2     building for four years.  His sister had lived in another

3     Bedford Pines building.  His brother and mother had lived at

4     Bedford Pines buildings.  His sister and his brother both

5     testified that crime was commonplace, that they saw many

6     things.  I believe his brother had a near miss while working

7     on the grounds there.

8          Mr. Davis himself testified that he knew of prior

9     shootings.  He knew of prior killings at Bedford Pines, and

10    maybe most palpably he drew a gun and shot back at these cars

11    within seconds.  He was ready to do so, and his brother

12    testified that you should have a gun when you go to this area.

13    So he certainly had plenty of background, plenty of awareness

14    of that.

15          THE COURT:  All right.  So switch to the other side

16    or maybe that's something Mr. Clayton can do because I'd like

17    to understand Wingate's position on its equal or superior

18    knowledge.

19          MS. WOODRICK:  Yes.  So I believe there was a

20    statement in the concurrence in *Carmichael* that the level of

21    knowledge of the defendant is not really a factor in whether

22    or not the plaintiff knew of the hazard that we're talking

23    about and had the knowledge and the ability to avoid the

24    hazard.  So that is a separate analysis.

25          And I would also say that in any case where a

1    property owner is proactive about keeping abreast of what is

2    going on in the area and works to reduce crime in the area and

3    therefore talks to police, you know, keeps up with what's

4    going on in the area, that they would be penalized for their

5    knowledge and be penalized for the fact that they are a

6    company of hundreds of people as opposed to one person and

7    comparing those two things, it would not be our position that

8    the plaintiffs needed to know of every single incident or

9    needed to get weekly updates of every single incident that

10   happened to have an appreciation of the hazard and know to

11   avoid it.

12            THE COURT:  Okay.  All right.

13            MS. WOODRICK:  If there are any other questions that

14   arise on the issues of knowledge and duty, I would be happy to

15   answer them.

16            THE COURT:  Okay.  Thank you.

17            MS. WOODRICK:  Thank you, your Honor.

18            MR. CLAYTON:  Judge, I'll just address your question

19   that you asked.  Does it matter if any of one of these people

20   were targeted or not for purposes of this motion for summary

21   judgment?  The answer to that is, no, it doesn't.  Because we

22   know that getting past -- we're not talking about somebody

23   targeting these gentlemen that night.  We're talking about the

24   risk of violent crime.

25            No one -- everyone agrees that drive-by shootings are

1 inherently difficult to know where they're going happen

2 without any forewarning.  There's no forewarning here.  Now,

3 obviously, Mr. Sims knew that a drive-by shooting could happen

4 on this block because he himself was shot, as Ms. Woodrick

5 said, one year beforehand.  There were other drive-by

6 shootings that had happened on this block, but no one knew it

7 was going to happen that day, that time.

8        There's one case that dealt with a drive-by shooting

9 in the context of negligent security in Georgia, the *Hillcrest*

10 case.  And while the *Carmichael* case came later and changed

11 the standard of substantial similarity to totality of the

12 circumstances, it didn't change the fact that both that case,

13 which discussed drive-by shootings in particular and the fact

14 that they can happen anywhere, they're random, they're

15 difficult to police against means that they are not

16 foreseeable as a matter of law under the totality of the

17 circumstances because of how drive-by shootings -- just the

18 nature of them.  This is a conclusion that both the Georgia

19 Court of Appeals has found, and then other cases around the

20 country have said the same thing, because of just a six-second

21 drive-by shooting is just not foreseeable because it's a

22 sudden, deliberate, and random act of violence.

23        So I don't think as far as the facts that we are here

24 about today, no one has stood up and said I was the target of

25 this.  No one has stood up and said I knew this was going to

```
 1  happen or that anyone had any forewarning.  But everyone has
 2  said if it was foreseeable to Wingate, it's foreseeable to all
 3  of them as well because they're just random in nature.  So the
 4  drive-by was not foreseeable as a matter of law, but it
 5  doesn't matter if these folks were intended or not because we
 6  know that the drive-by shooting happened there in 6 seconds.
 7  And they were just shooting at a group of people.
 8         Beyond that, so if it's not foreseeable because,
 9  again, this is a unique -- totality of the circumstances means
10  that you have to look at a drive-by shooting in particular.
11  You can't just look at anything else, and the courts that we
12  have cited, I don't believe they have cited any to the
13  contrary, that have ever found that a drive-by shooting in the
14  negligent security context was foreseeable.  We have cited
15  ones for Michigan, Georgia, and New Jersey that have said it's
16  not but --
17         THE COURT:  Your position is drive-bys are always
18  unforeseeable?
19         MR. CLAYTON:  Unless there is some forewarning about
20  it, yes.  There is no way to know that a drive-by shooting is
21  going to happen on that particular day, on that night.  But if
22  anyone could know because of knowledge of prior crime, the
23  plaintiffs had that knowledge.  Their expert admits it.  If
24  it's just a general crime can happen in the area, they knew
25  it.  Mr. Sims was shot in a drive-by shooting there.
```

1      They all testified there's specific facts -- and
2  they're in the briefs -- about knowledge of crime in general,
3  but if you drove out on a specific hazard, the specific hazard
4  is the drive-by shooting, the 6-second car doesn't stop,
5  people are being shot out of a window that night, at that time
6  instead of an hour before, an hour later.  When people are
7  going to steal a car and drive down the road and open fire and
8  immediately speed off, the timing of that is going to be
9  random.  That is what courts have found.  The Georgia Court of
10  Appeals says, you know, that it's an act of terrorism that
11  occurred -- that could have occurred anyway.  I mean, that is
12  true because of the moving nature of the targets.
13      In addition to not being foreseeable, we would
14  also -- it's not preventable.  Now, their expert,
15  Ms. Dumbaugh, says that we had a reasonable security plan.
16  Now, it is true we did not have an APD officer working on a
17  shift for all 700 units over a mile.  I don't know exactly
18  how -- like, it's all up and down Boulevard and Parkway and
19  off the streets.  So this is a very large complex because all
20  the buildings, they're surrounded by city sidewalks and city
21  streets.  And this is a city street, and this is a city
22  sidewalk.  We can't police the streets or the sidewalk.
23      So we get into preventability.  We didn't have -- our
24  security plan didn't call for someone to be just sitting on
25  this block.  It was someone to be roving around.  It is true

1   we could not cover that shift.  This is in the middle of

2   COVID.  There were also protests that were happening in the

3   city of Atlanta.  We had allocated resources to hire APD

4   officers for overnight shift.  We couldn't get them covered

5   every single night of the week.

6          They have to show that inadequate security measures

7   of the property were the cause of the injuries.  No one can

8   say that.  Saying we have one roving officer, if there was

9   somebody there that evening -- and remember we don't have

10  24-hour seven-day-a-week coverage, and they acknowledge our

11  security plan is reasonable.  But they would have to speculate

12  that somehow for this 6-second encounter, that a roving patrol

13  would be driving around and that they would have heeded our

14  security officer somehow and then decided not to do it.  And

15  that is speculation and in general about anything.

16         As to drive-by shootings, again, the *Hillcrest* Court

17  found it difficult to imagine what effective acts that the

18  owner could reasonably have taken which could have prevented a

19  drive-by shooting, even had there been a prior such event.

20  That's what the Georgia Court of Appeals says about

21  preventability about drive-by shootings because they are

22  particular.

23         The other thing to remember is the plaintiffs were on

24  our property.  There is no dispute about that, because it goes

25  city street, city sidewalk, our property.  So they were on our

1   property.  There's a video of it.  But it's also undisputed
2   that the shooters never set foot on our property.  They never
3   even stopped.  They were from a city road that we have -- that
4   everyone agrees we have no authority to police, to stop
5   people, to do anything.  Observe and report.  If we saw a car
6   driving and shooting somebody down that, we would call the
7   police.  We can't stop them on a city street.  We can't
8   confront them before they commit an act of violence because
9   they never came onto our property, and we private property
10  owners have zero right to control the streets.
11          THE COURT:  But aren't the plaintiffs saying that if
12  you all had more APD officers or DeKalb officers on the
13  street, you know, outside of the premises, that that could
14  have prevented it?  Like if an officer was parked right
15  outside this area?
16          MR. CLAYTON:  No, because they say our security plan
17  is reasonable, and our security plan didn't include that.
18  They're saying that if you had filled a slot for that day,
19  which wasn't 24-seven -- again, this isn't -- this is not what
20  we're talking about.  I believe it was a hundred or so hours a
21  week of APD coverage.  We wanted to get more night coverage.
22  We had these resources allocated.  We had an APD manager
23  setting all these things up, but between COVID and everything
24  else, we couldn't get the slots filled.
25          There is zero, zero evidence in this case, that

1   anyone could have filled that slot that night, none.  We had

2   an open paycheck waiting for APD.  APD managers were trying to

3   fill the slots, and they couldn't do it.  This isn't a random

4   day.  This is on that day during COVID when there were

5   protests that were going on through the city of Atlanta.  They

6   can't at all leave, for officers, because they were dealing

7   with that, because this is again in June of 2020.

8          There is no evidence -- it is undisputed that there's

9   no evidence that there was anyone available to hire that

10  night.  So without anyone available to hire that night and

11  having a reasonable security plan, there's nothing else we had

12  to do.  We didn't have to put somebody there, but even if they

13  said that, which they haven't, they haven't shown that there

14  was anyone available to do that.

15         So this isn't preventable, but when it comes to off

16  property crimes in particular, we cited that the *Hill* case --

17  that you're not required to put bullet proof glass.  You're

18  not required to build tall walls to prevent someone from off

19  property randomly shooting onto your property.  So there is

20  nothing that would have prevented this that they have

21  proved -- that there is any evidence was available at the

22  time.

23         Georgia law doesn't impose a duty to have a police

24  officer outside of every building at all hours of the night,

25  and not even they say that's required.  They say the hundred

1 hours plus Plaza Security, where we had a couple of people

2 working, plus we had paid money to buy cameras, plus we had

3 bought the police foundation cameras that tie into the

4 networks, we did more than anybody else in the area or on the

5 block.  But as it pertains to that night for a drive-by

6 shooting, there is zero evidence that we could have done

7 anything to have prevented it, even if it was foreseeable,

8 which, again, it was not, and I would again go back to the

9 *Hillcrest Foods* case that granted summary judgment to the

10 landowner and the court about causation.

11          They're going to say, again, the standard of

12 foreseeability in that case changed because of *Carmichael*.

13 That is true.  But proximate cause did not, and proximate

14 cause is required in every case.  And when you look at the

15 unique nature of drive-by shootings, you have to understand

16 that that is what we have.

17          So this is a case where we have individual situations

18 where two of the individuals would have been arrested on site

19 had an APD officer been there.  Mr. Long, he had been arrested

20 a few months before this, before setting foot on the property.

21 That's when it comes to the trespassers versus not, not.  So

22 we have that.  We have foreseeability.  We have preventability

23 and the duty owed to them.  There are many different.  Some

24 are common, some are not, but any one of which means that

25 summary judgment is owed on each particular case because,

1   again, there are overlaps, but there are also differences in

2   there.

3        The other thing to remember is this is not a case

4   where any of the conduct that led to this happened on the

5   premises.  Everything happened off premises.  Because the car

6   was driving in the street, the people opened fire, we're not

7   saying that the plaintiffs here, that they did something that

8   night that brought about these people to shoot them that

9   night.  That's -- as I mentioned about the intended, it

10  doesn't matter for purposes of this argument, but all of the

11  conduct that led to it happened outside.

12       The fact that we didn't have an officer available

13  that night despite trying, where there is no evidence that

14  there are any available does not mean that summary judgment

15  has to get denied.  Because what's a jury going to figure out

16  at that point in time?  Well, there's no evidence any officers

17  were available.  Their security plan was reasonable.  These

18  people, what more could they do?  That's -- there's nothing

19  for them to decide other than to say, well, maybe you could

20  have gotten an officer.

21       I mean, you could have called somebody; right?

22  Couldn't you have done something?  That's speculation and

23  conjecture, and that's when you get to the preventability

24  piece.  But to get there you have to get past foreseeability.

25  Before that you have to get past the whole idea of only

1   willful and wanton for the trespassers and the different

2   standard for the licensees.

3       So I don't want to drone on.  If you have any

4   questions, we can answer them.  If not, I can allow,

5   obviously, a seat to Mr. Bouchard who can obviously address

6   the issues.

7       THE COURT:  I'm good.  Thank you.  You did answer my

8   questions.

9       MR. CLAYTON:  Thank you, Judge.

10      MR. BOUCHARD:  Good morning, your Honor.

11      THE COURT:  Good morning.

12      MR. BOUCHARD:  With the Court's permission, I would

13  hook up and intend to go through a PowerPoint that I think

14  addresses some of the Court's questions and some of the points

15  that were made by defense counsel.

16      THE COURT:  Sure.  Let's see if we can get that up.

17      MR. BOUCHARD:  So thank you again, your Honor, for

18  the opportunity to be heard.  David Bouchard, I represent the

19  plaintiffs in these cases with Ms. Oto Ekpo.  What I'd like to

20  do, your Honor, is use the majority of my allotted time to

21  cover different points that the defense raised in its reply

22  briefs, which obviously the plaintiffs did not have an

23  opportunity to respond to.  I'm happy to take any questions

24  that the Court has as we go.  I'm going to try to address the

25  Court's questions previously as I go through this

1 presentation.

2        As of June 29th, 2020, Wingate knew it had a problem

3 at Bedford Pines, specifically at 639 Parkway because at 639

4 Parkway, Wingate considered a primary problem area based on

5 its extensive history of violent crime.  It included seven

6 drive-by shootings at or around 639 Parkway in just the 14

7 months immediately preceding June 2020.  Six times per week,

8 according to the security manager at Wingate, Jim Tate,

9 vehicles drove down Parkway Drive and fired guns with bullets

10 headed towards 639 Parkway or the adjacent buildings.

11        According to Wingate's corporate rep, Cynthia Bianco,

12 Wingate anticipated shootings at or around 639 Parkway.  And

13 according to Jon Groussman, Wingate's security expert,

14 shootings were, quote, predictable.  Wingate's knowledge of

15 the dangers at and around 639 Parkway far surpassed anybody

16 else's.  Their knowledge of the persistence, the volume, and

17 the frequency of gun violence around 639 Parkway surpassed

18 anyone else's.

19        Something happened around March 2020 that created a

20 specific problem for Wingate, and that was as of March 2020,

21 APD's notification to Wingate that APD was having difficulty

22 staffing.  At this March 4th, 2020 meeting, APD Major Villa

23 Royale (phonetic) met with certain Wingate personnel to talk

24 to them about, among other things, lack of presence from APD

25 in the neighborhood.  And one of the things that they

1  discussed is the lack of officers available at APD.

2          Well, that lack of officers not only applied to

3  on-duty APD as of March 4th, 2020, but it also applied to

4  off-duty.  And off-duty APD remember was the sole source of

5  physical security at Bedford Pines.  So as of March 4th, 2020,

6  Wingate gets this notice from APD about a shortage of

7  security, and this is testimony from Wingate's 30(b)(6) route

8  confirming that if APD is having challenges with getting

9  enough on duty, that spills over to off duty as well because

10  the pool from which off duty is drawn, is the on-duty pool.

11          So as of March 2020, Wingate knows that it's got a

12  shrinking pool of physical security to provide the needed

13  security at Bedford Pines, and the negligence in this case

14  begins then because it's from March to June 29th that Wingate

15  doesn't do anything to address the known coming problem, the

16  lack of physical security for its primary problem area.

17          So as of June 29th, 2020, Wingate had nobody

18  securing, monitoring, or even working at 639 Parkway.  In

19  fact, what's worse is that the record evidence shows that

20  there was somebody working in this space running an outdoor

21  restaurant in the parking lot on the left there.  We have

22  testimony from Wingate's chief development officer, Rod

23  Teachey, that there was a lot of congregating in that parking

24  lot and that that was in the spring and summer of 2020.

25          We have affidavit testimony, and we have deposition

1  testimony from Stephanie Lewis.  And I apologize it's a little
2  hard to see the image there, but there's a black X mark in
3  that photo where Stephanie Lewis indicated where she would
4  park her outdoor restaurant food van, play music, set up her
5  grill, sell food and drinks, and attract people.  And the
6  people who bought her food and drinks would congregate in that
7  parking lot and in the adjacent common area at 639 Parkway,
8  which is right next door.

9        So Wingate both knew that there was an APD shortage
10 in the spring and summer of 2020.  It knew that there were
11 lots of gatherings occurring in its primary problem area
12 during that same period, and it also should have known that
13 Stephanie Lewis was operating an outdoor restaurant in that
14 area because she was there night after night.  It was no
15 secret.  It was open and obvious.

16       So on the night of June 29th, Bedford Pines' tenants
17 invited the plaintiffs to come visit, and each plaintiff has a
18 unique story.  Each plaintiff has a unique history.  But each
19 plaintiff to a person was invited, as the record evidence
20 demonstrates, by a Bedford Pines tenant to visit the property
21 that night, and each plaintiff did visit Bedford Pines that
22 night.  And during their visits they were drawn to the common
23 area at 639 Parkway where gatherings were frequent, where the
24 outdoor restaurant was operating in full swing.  And after
25 some of them ate, after some of them socialized, cars drove

1 down the block and fired.  Five men were shot.  One was
2 killed.
3          Wingate retained only 5 minutes of footage of this
4 incident, even though its custom is to maintain an hour, and
5 it's spoliated evidence, which now makes it very difficult for
6 us to recreate exactly what happened beyond the testimony of
7 the plaintiffs.
8          As the Court knows, the summary judgment standard in
9 negligence cases is all facts must be considered in the light
10 most favorable to plaintiff.  All reasonable inferences must
11 be drawn therefrom in plaintiff's favor, and specifically the
12 Georgia Supreme Court said in 2017 it's only where the
13 evidence is plain, palpable, and undisputable that summary
14 judgment is appropriate in a negligence case.
15          I want to just pause and say that I actually think
16 the best argument as to why Mr. Clayton and Ms. Woodrick's
17 argument should be denied, is their argument itself because
18 what their argument does is it cherrypicks and selects the
19 best facts from the defense's standpoint.  It then explains
20 why those cherrypicked facts support the defense's position in
21 the case and says summary judgment should be granted, your
22 Honor, because these select facts support our position in the
23 case.  But, of course, that's the opposite of the summary
24 judgment standard.
25          They can recite the standard, but they're not

1    applying it.  To apply it would be to consider all facts and
2    to construe all facts in the light most favorable to the
3    plaintiff, not only those facts that the defense finds
4    beneficial.
5         The defense raised four issues in its motion for
6    summary judgment, and I'm going to briefly touch on those.
7    But the overarching point that I want the Court to hear me say
8    is that there's a common thread, a common issue at the summary
9    judgment stage with all four of these issues.  And that common
10   thread is this:
11        All four are jury questions.  So the first issue is
12   plaintiffs' statuses at Bedford Pines and the duty Wingate
13   owed to them.  Well, conflicting evidence on status and on the
14   scope of invitation is a jury question.  Judge Leigh Martin
15   May decided that in *Wiltse* in 2024 in a shooting case outside
16   of a Wal-Mart, and *Clark Atlanta* is an earlier case from the
17   Georgia Court of Appeals that makes the same point.
18        An implied invitation based on permitted usage and
19   practice is also a jury question.  That comes from *Jewell*
20   *Cotton Mill*, which is one of the cases that the pattern
21   instruction is based on, and it comes from *Cham*, a 2021
22   Georgia Supreme Court case.  The duty owed to licensees under
23   the circumstances at hand here is also a jury question, and I
24   direct the Court to *Bethany* on that.
25        Reasonable foreseeability.  Under *Georgia CVS*, which

1 is the 2023 Georgia Supreme Court case, unless no rational

2 juror could find the act reasonably foreseeable, it's a jury

3 question.

4       On proximate cause it's undeniably a jury question

5 unless the evidence is plain and undisputed.

6       On superior knowledge it's a jury question because,

7 quote, it involves the relative knowledge of the proprietor

8 and the plaintiff. And I'm quoting from footnote 7 of *CVS v.*

9 *Carmichael*. And the relative knowledge is a comparative

10 exercise that requires a factual analysis. But even if the

11 Court were prepared to decide as a matter of law, which we

12 don't think it should, that the knowledge was equal, even that

13 leaves a jury question as to whether or not the plaintiffs

14 exercised ordinary care. And I'm citing to *Ellington* for that

15 point.

16       So to go through these briefly, plaintiffs are

17 arguing that they were invitees both express and implied and

18 that even if they were only licensees -- and I could add or

19 trespassers for the sake of argument -- then Wingate still

20 owed them a duty of ordinary care under the circumstances

21 here. And, also, Wingate was actively negligent, which makes

22 status irrelevant.

23       So to start with express invitation, tenants invited

24 plaintiffs to visit Bedford Pines period. That's undisputed.

25 Plaintiffs then visited Bedford Pines. That too is

1  undisputed, and they were shot in a Bedford Pines common area.
2  All of what I've said on the screen is undisputed.
3        Then under O.C.G.A. 51-3-1, therefore there is a jury
4  question, whether the plaintiffs were invitees while they were
5  in a Bedford Pines common area after being invited to Bedford
6  Pines by Bedford Pines tenants.
7        I recognize that there are going to be factual
8  conflicts at trial about the scope of the invitation and
9  whether or not the tenants themselves had the right to be out
10 in that area, but all of those types of conflicts about the
11 status of a visitor and the scope of an invitation are jury
12 questions not appropriate for summary judgment.  And I'm
13 citing to *Wiltse, Clark Atlanta*, and *Cham*.
14       Now, Wingate has raised an argument in its reply
15 brief about the lease, and it has argued that while the folks
16 who invited the plaintiffs to come visit that night, well,
17 those tenants didn't have the right under the lease to loiter
18 in common areas.  Therefore, if the tenants didn't have the
19 right, well, the plaintiffs didn't either.  This argument
20 falls flat for a few reasons.  I'm going to go through those
21 now.
22       First, Local Rule 56.1(B) says that the Court will
23 not consider any fact set out only in the brief and not in the
24 movant's statement of undisputed facts.  So our first response
25 is that this was waived under 56.1(B) because if you look at

1   the defendant's statement of material facts, it doesn't

2   mention the lease.  It doesn't mention the house rules, and it

3   doesn't mention common areas.  The only thing it says that

4   even tangentially relates is it talks about there being

5   signage forbidding loitering, but it doesn't talk about any

6   contractual agreement that the tenants at issue had agreed to

7   and signed.

8        In fact, if you look at the alleged contract itself

9   that the defense attached to its reply brief, it's unsigned.

10  The tenants who extended the invitations didn't even sign

11  this, but this is what Wingate attached to its reply brief.

12  So, obviously, tenants cannot be bound by an unsigned

13  contract, especially when the language in the contract, which

14  I've highlighted, says that you're agreeing by signing below.

15       There's another problem.  The alleged contract itself

16  concerns an unidentified person whose name is redacted, not

17  the tenants who invited the plaintiffs in this case.  Also, it

18  addresses rental of Apartment 101 at 464 Boulevard, which this

19  case does not concern, during a time period, 2018 to 2019,

20  that this case doesn't concern.  So Wingate's arguments about

21  the house lease and contractual rules that prohibited

22  loitering and that all the tenants had agreed to be bound by,

23  it falls flat for about four very solid reasons.

24       Let's assume for the sake of argument that the

25  unsigned lease contract is valid.  Well, then there are still

1    fact questions about whether the plaintiffs are loitering

2    under Georgia law.  As the Court asked, what's the definition

3    of loitering, it's a great question.  It's not defined in the

4    so-called lease contract.  There's no definition provided in

5    Wingate's supposed contract.  The Georgia code does define it,

6    and it says that it includes somebody being in a place at a

7    time or in a manner not unusual for law abiding individuals

8    under circumstances that warrant a justifiable and reasonable

9    alarm or immediate concern.

10           It's worth noting that none of the plaintiffs were

11   ever charged with or cited for loitering.  That alone creates

12   a jury question as to whether they were loitering.  The bottom

13   line is that there's extensive record evidence that an outdoor

14   restaurant operated at 645 and that people regularly gathered

15   around it.  There's at least a jury question as to whether

16   people who went to that restaurant were loitering under

17   Georgia law.

18           The Court could stop there because that's express

19   invitation, and that alone is enough to create a jury question

20   and to trigger a duty of ordinary care by Wingate.  But if the

21   Court wanted to go beyond the express invitation, there's also

22   an implied invitation, which is a separate basis to find that

23   Wingate owed a duty of ordinary care under 51-3-1.

24           So this is the pattern instruction under Georgia law

25   on implied invitations, and what's notable is that it allows

1  for situations where an owner doesn't do something itself but

2  it permits something to be done, which would fairly indicate

3  to the person entering that the entry and use of the property

4  is consistent with the intents or interests and purposes of

5  the owner.  That's this case.  That's the outdoor food

6  restaurant.

7          In the reply brief Wingate said, well, plaintiff

8  couldn't even cite a case example.  It only cited to the jury

9  instructions.  Well, as the Court knows, pattern instructions

10 are based on cases, and the pattern instruction here is based

11 in part on *Smith v. Jewell Cotton Mill*.

12         *Jewell Cotton Mill* is a 1923 case with some

13 references that are going to seem a little bit outdated, but

14 it talks about there being a custom at a cotton ginnery of

15 people going into the cotton ginnery's boiler room in the

16 basement while they were waiting on their cotton to be ginned.

17 And the Court said because there were evidence that this

18 practice had existed for, quote, so long that it should have

19 been known to the defendant, it gave rise to an implied invite

20 to wait in the boiler room.  So when the deceased was killed

21 in the boiler room when the boiler exploded, he was there

22 pursuant to an implied invitation to wait in the boiler room.

23         Well, how does that apply here?  Stephanie Lewis

24 regularly operated an outdoor restaurant at 645.  Wingate knew

25 that people congregated there.  Wingate, as the manager, was

1  on constructive notice because a reasonable inspection would

2  have revealed what she was doing out in the open.  She wasn't

3  trying to hide.  She was trying to make money and sell food

4  and drinks, and it appeared to be a benefit or amenity for

5  Bedford Pines.  At least there's a fact issue about that.

6        Ricky Phillips testified that he was visiting his

7  girlfriend, Jasmine Manga, and every time he went over there

8  he would go get food from the food truck because she enjoyed

9  it and he enjoyed it.  Together this at least creates a fact

10 jury question as to implied invitation.  Setting aside the

11 express invitation, this at least creates a jury question on

12 implied invitation.  So even if the Court said there's no

13 express invitation, there's only implied invitation, that's

14 enough to trigger a duty of ordinary care.

15       I want to move on and address this even if they were

16 licensees or trespassers argument, does that matter.  And in

17 this case the answer is no.  I fully recognize that 51-3-1 and

18 -2 outline different standards of care for invitees and

19 licensees, and yet *Bethany* -- *Bethany* is a Georgia Court of

20 Appeals case that's good law, that's binding, that says a

21 principle that's been reiterated in Georgia law for years,

22 which is it's usually willful or wanton not to exercise

23 ordinary care to prevent injuring a person who is actually

24 known to be or may reasonably be expected to be within the

25 range of a dangerous act or a hidden peril.

1     In *Bethany* the Court was talking about a taxi driver

2 coming to an apartment community where there had been armed

3 robberies.  And the *Bethany* Court said there's a question of

4 fact here about whether *Bethany* breached a duty because it

5 should have known that taxi drivers, they're expected to be

6 coming to this apartment community, and it's lack of security

7 arguably was a proximate cause of the ultimate armed robbery

8 of Mr. Grobman, the driver.

9     So *Bethany* applies here, and I'm going to walk

10 through the different provisions of it.  Preventing injuring a

11 person.  The record evidence shows that guards more likely

12 than not would have deterred the assailants, that there was an

13 opportunity to disperse the outdoor restaurant and the

14 gathering itself, that there was an opportunity to warn, and

15 that the plaintiffs would have heeded the warnings.

16     Reasonably be expected to be should be very

17 straightforward because as we've covered, there's record

18 evidence that Wingate knew people gathered in these common

19 areas on that block in its primary problem area.  Within range

20 639 was the primary problem area based on a history of

21 shootings and violent crime, and the dangerous act or hidden

22 peril is also clear.  Bullets flying towards 639 Parkway is a

23 dangerous act.  The lack of monitoring or security working at

24 Bedford Pines is a hidden peril.

25     The defense continues to hammer that this shooting

1   occurred from a public road.  Well, tell that to Marcus Sims's

2   family or the other plaintiffs who were shot on Bedford Pines'

3   property.  As far as they know, the shooting happened on

4   Bedford Pines' property because that's where they were shot.

5   It doesn't so much matter where the bullets were fired from.

6   If they're coming onto your property, that's a dangerous act.

7        We've never said and we're not arguing and our

8   experts haven't opined that they should have put up walls or

9   gates or bullet proof windows because that's not what this

10  case is about.  This case is about an open and obvious risk,

11  people gathering in a primary problem area outside right in a

12  grassy space for hours.

13       Ms. Lewis was operating her restaurant for hours that

14  night.  There was every opportunity to disperse them.  There

15  was every opportunity to try to enforce the rules and remind

16  people to move along.

17       THE COURT:  So your position is that the outdoor

18  restaurant was the danger that Wingate failed to prevent or

19  get rid of?

20       MR. BOUCHARD:  My position is that allowing folks to

21  gather in a primary problem area for an extended period is a

22  dangerous act itself and that --

23       THE COURT:  Okay.  So what should they have done?

24       MR. BOUCHARD:  If they had had somebody, either a

25  security guard, somebody working for Wingate, somebody on

1   staff go up to Ms. Lewis and say, hey, you've got to pack it

2   up, I know there's no signage here, but you're actually not

3   allowed to operate your restaurant here.  And folks who are

4   over here eating, dancing, hanging out, y'all need to pack it

5   up too.  I'm sorry to do this to you, but this is an area

6   where we've had some security issues lately.  You may not have

7   heard, but we've had some shootings out here and I don't want

8   any of y'all to have an issue.

9           I don't even think that requires a security guard,

10  and our expert said it didn't have to be a security guard, it

11  could have been a staff person, could have been putting up

12  warning notices.  Doesn't even have to be a human being.  It

13  could say we don't have the -- you know, APD has staffing

14  shortages.  Please be advised.  Or, you know, we are not able

15  to staff at the regular rates.  Please be advised.  There's

16  sort of a different range or menu of options.

17          THE COURT:  The defense is arguing that your expert

18  agrees that their security plan was reasonable.  So where are

19  these arguments coming from?  Who supports these?

20          MR. BOUCHARD:  Yeah.  So with due respect, that

21  representation is taken out of context.  We have three experts

22  in this case:  Mr. Charles Ahmad, who actually used to work in

23  this courthouse as a U.S. deputy marshal; Dr. Jane Gray, who's

24  a Ph.D. criminologist who's been an expert in over 200 cases;

25  and Elizabeth Dumbaugh.  Elizabeth Dumbaugh is the expert to

1   whom they're referring, and she said, I agree that as written
2   the security plan looks reasonable.  My criticism is not
3   what's written on the paper.  My criticism is the
4   implementation.  It wasn't implemented properly.
5          So this case isn't about some abstract exercise and
6   did they write down the right security plan.  It's in practice
7   what did they do, and what they did was negligent.  What they
8   did was inadequate.
9          That leads to this point, which is that active
10  negligence applies too.  We can sort of bypass and get off the
11  highway of what status for the plaintiffs if we go to act of
12  negligence, and I direct the Court to *Khalia v. Rosebud*, a
13  shooting case in a gas station parking lot where the Court --
14  Georgia Court of Appeals said the failure to maintain security
15  required under dangerous conditions known -- well, that
16  certainly applies here -- or to warn customers and their
17  guests of those dangerous conditions, that applies here too.
18         So what Wingate is saying is that, well, we weren't
19  actively negligent because this happened to us.  APD couldn't
20  staff at the levels we wanted.  We had the check ready to go.
21  APD just couldn't provide what we wanted.  Well, there's a lot
22  of issues with that argument.  The first is that it wasn't
23  APD's property.  It was Wingate's property.  And Wingate had
24  the duty to manage its property under 51-3-1 through -3 which
25  includes a duty to maintain a safe and secure property.  And

1  so if their current plan for security, off-duty APD, is not
2  available at the levels they need, they have to pivot.  They
3  can't just sit idly by and say, well, we tried with one
4  vendor, guess that's the scenario.
5      In fact, there's evidence, which I'm going to go
6  into, despite what Mr. Clayton said, that shows that there was
7  security available that they didn't pursue.
8      So I want to move to foreseeability now, and *Georgia*
9  *CVS v. Carmichael* governs period.  This is the binding Georgia
10 case on foreseeability of third party criminal acts.  The
11 defense has made a bunch of arguments in its reply brief and
12 its initial motion about, well, this state and that state and
13 *Hillcrest*.  And the problem is that we don't need to worry
14 about what other states say.  We need to focus on Georgia law,
15 and *Hillcrest* is no longer good law.
16     *Georgia CVS v. Carmichael* is the last word from the
17 Georgia Supreme Court on how you assess foreseeability, and it
18 says it's the totality of the circumstances.  It explicitly
19 cites -- I want to emphasize this.  *Georgia CVS v. Carmichael*
20 cites the only drive-by shooting case from the Georgia Court
21 of Appeals, which is the *Hillcrest* case.  And *Carmichael* says,
22 our standard in any third party criminal act case is totality.
23 And it cites to the *Hillcrest* drive-by shooting case in saying
24 that.  And under *Carmichael* whether the third party act was
25 foreseeable is a question for the fact finder unless no

1   rational juror could find otherwise.

2          As discussed in briefing, which we'll stand by, there

3   is substantial record evidence of reasonable foreseeability to

4   Wingate under the totality of the circumstances.  And, also,

5   separately *Carmichael* says the volatile situation brewing is

6   enough to give rise.  And we would argue that when you have

7   folks in an outdoor restaurant set up and gathered in a

8   primary problem area with seven drive-by shootings in the last

9   14 months and so many shootings in general, that Wingate

10  itself is saying we anticipated them, that's a volatile

11  situation brewing.

12          Proximate cause, it's axiomatic, this 2017 Georgia

13  Supreme Court case, that it's undeniably a jury question

14  unless it's plain and undisputed.  And I want to note that, as

15  Judge Martin May did in *Wiltse*, that foreseeability is related

16  to proximate cause because when an owner reasonably

17  anticipates third party criminal acts, it can take steps to

18  prevent against them.  Those two concepts are tied together.

19          Wingate's negligent failure to have security in its

20  primary problem area more likely than not proximately caused

21  plaintiffs to be shot, and I would cite to the Court Charles

22  Ahmad's expert opinion, which is in the record; Dr. Gray's

23  expert opinion, which is in the record; and Elizabeth

24  Dumbaugh's expert opinion.  None of the plaintiffs' experts

25  opined everything was fine on June 29th, and we don't think

1 Wingate acted negligently.  All opined that more should have
2 been done including security guards.
3      This is evidence that I will cite the Court to from
4 Cynthia Bianco, 30(b)(6) corporate rep for Wingate, where in
5 the top right she's asked about proposals that Wingate
6 received from security firm CDI and Plaza.  And I said to her
7 CDI seems to be more like a firm that would replace APD and
8 provide the online -- the on-site physical security services
9 that APD had been providing.  Wingate, not Ms. Bianco, Wingate
10 agrees.
11      Then in the bottom left it says, obviously, Wingate
12 went with Plaza, not with CDI.  Seems clear to me that Wingate
13 opted for the director of security role, not the physical
14 security services that CDI could provide.  Correct.
15      So there's another armed physical security provider
16 out there that Wingate had a proposal from, CDI, that Wingate
17 even after learning from APD that APD had diminished on duty
18 officers available, Wingate never followed up with.  But, of
19 course, there's also out-of-jurisdiction officers.  There's a
20 lot of other post certified officers in the state of Georgia
21 outside of APD who weren't dealing with the demonstrations and
22 the protests that APD was, and Wingate didn't look into
23 out-of-jurisdiction officers as a replacement.  There's
24 testimony that they used them to supplement, but they never
25 tried to use them as a replacement.

1    All three experts for the plaintiff, Dumbaugh, Ahmad

2  and Gray testified that there are other security providers in

3  2020 providing security services who could have fit the bill

4  for what Wingate was looking for.

5    Here's the last point I want to make on this:

6  Wingate's argument is, Judge, they can't show proximate cause

7  because they haven't even shown there was a security provider

8  that could do what they're saying needed to be done, and I've

9  pointed the Court to this example and some others that I think

10  answer that.  But there's another problem with that argument,

11  which is that was negligent unto itself.

12    The reason why we're in that position is that Wingate

13  never sent out requests for proposals.  It never said, hey,

14  APD doesn't have the staffing we need, why don't we look

15  around and see if we could get bids from other vendors.  That

16  was negligence, and so by June 2020, four months later, the

17  same problem still existed.

18    The last thing I want to say on proximate cause is

19  it's not only about lack of security guards.  Wingate also

20  negligently failed to have anyone, whether security or

21  otherwise, monitor the property, enforce rules, disperse the

22  outdoor restaurant and gathering, and/or warn.  And this was

23  at any time on the night of June 29th or June 30th.

24    The last point I'm going to touch on and the last

25  issue is superior knowledge, and as I've said, under footnote

1   7 in *Georgia CVS v. Carmichael*, the Georgia Supreme Court said

2   that's a relative inquiry because superior is by nature

3   comparative.  And there are facts supporting that Wingate had

4   superior knowledge.  Those are laid out in the briefing, and I

5   think at best there's a jury question on that, if it's not

6   already established that Wingate had superior knowledge.  But

7   even if the Court were to decide as a matter of law that there

8   were equal knowledge, it's still a jury question, and I'm

9   citing again to Judge May there from that Wal-Mart parking lot

10  shooting case about ordinary care.

11          I did want to make just a couple final points before

12  I sat down, unless the Court had any questions for me, just a

13  few things that were said.

14          So Wingate has characterized all drive-by shootings

15  as random sudden events that are extremely difficult, if not

16  impossible, to anticipate without, quote, forewarning.  Again,

17  that defies *Georgia CVS v. Carmichael*, which says for

18  reasonable foreseeability we look at the totality of the

19  circumstances.  And it's as if Wingate wants this Court to

20  veer away from what the Georgia Supreme Court said and say

21  you're right, in drive-by shooting cases we have a separate

22  rule.  We require forewarning.

23          That's not totality of the circumstances.  It's

24  either totality or it's not, and what Wingate is really trying

25  to ask for is foreknowledge, which is not the standard.  It's

1  foreseeability.  And so they didn't need a warning.  They

2  needed to reasonably anticipate it, and they did.

3      In fact, even if the Court said a warning was

4  necessary, they got it.  On June 23rd, 2020 there was a

5  shooting at 639 Parkway Drive, drive-by shooting, under very

6  similar circumstances.  And that video footage is in the

7  record.

8      Video spoliation is the last issue, and so to the

9  extent that we're talking about this being a sudden event, a

10  difficult to stop event, it's very hard for us to respond to

11  that because the best evidence is the video that Wingate

12  didn't preserve.  We have a neighbor's video footage from an

13  hour before the shooting that shows one of the assailant's

14  vehicles in the immediate vicinity of Bedford Pines.

15      Well, a whole host of questions emerge from that.

16  Was one of the assailants at Bedford Pines that night?  What

17  were they doing there?  Who were they with?  Was there

18  actually something that transpired on the property that night

19  that gave rise to this event that made it foreseeable to

20  Wingate?  Was this not just a shooting from a public drive?

21  Was this actually an incident that started on Bedford Pines'

22  premises?

23      THE COURT:  You didn't really touch on the issue of

24  your client's knowledge.  Is it that you're saying that

25  notwithstanding your client's familiarity with the area

1   involvement in crime, Wingate still had superior

2   knowledge?

3           MR. BOUCHARD:  The short answer to that is yes.

4           THE COURT:  And it's based on them maybe knowing more

5   of the details of these incidents as opposed to your clients

6   just having general knowledge?

7           MR. BOUCHARD:  Correct.

8           THE COURT:  Okay.

9           MR. BOUCHARD:  Obviously, as the Court knows, each

10  plaintiff has a different story.  Some were generally aware of

11  it being a high crime area.  Well, that's clearly not enough

12  because a lot of these young men said everywhere I went in

13  Atlanta was a high crime area, so there was nothing unique

14  about this area that I considered to be particularly

15  dangerous.  If I had, I wouldn't have gone to the food truck.

16  I wouldn't have been standing in the front yard.  So if I'd

17  been warned, if security had been there, you know, I would

18  have heeded that.

19          There's affidavits in the record -- the plaintiffs

20  weren't asked this in their depositions -- where they say if

21  somebody had told me, hey, y'all need to leave, I would have

22  left.

23          If there's any other questions that the Court has,

24  I'm happy to take them.

25          THE COURT:  I do about the punitive damages and the

1  attorney's fees.  Can you explain what facts.  Is it the

2  security measures that you're saying leads to a finding that

3  the defendants were acting in bad faith?

4          MR. BOUCHARD:  I think it's that entire want of care,

5  sort of conscious indifference standard, your Honor, and the

6  way I get there is starting in March 2020 with that APD memo

7  and the notice provided to Wingate identifying for Wingate,

8  hey, guys, there's a problem looming.  We have a shortage of

9  on-duty APD.  And Wingate's recognition of that translated to

10  there's a shortage of off-duty APD too, which is our supply of

11  physical security.  So that four-month window that they had to

12  respond before the June 2020 incident, they didn't use it.

13          If our incident had happened, frankly, your Honor, if

14  our incident had happened on March 6th, you know, two days

15  after that memo that I showed from APD, I think this would be

16  a very different case in terms of did Wingate really have

17  enough time to process and respond and send out requests for

18  proposal.  They had 120 days.  They had more than adequate

19  time to start to make moves and implement moves to fix the

20  shortfall and plug the void.  That's the word that they're

21  property manager, Alanna Robinson, testified to.  If you have

22  a void of security in a primary problem area, I think at base

23  you have a duty to warn folks, at base.  That's basic ordinary

24  care.

25          There's certainly a jury question on that, that I can

1  imagine reasonable jurors deciding that there is a basis for

2  punitive damages on failure to warn alone, let alone if you

3  can't find security.

4  THE COURT:  Okay.  Two more other questions not

5  related to the merits.  You had filed the motion in

6  Mr. Davis's case related to the suggestion of death, and I was

7  a little bit uncomfortable about granting that before -- I

8  forget.  Is it his mother?

9  MR. BOUCHARD:  That's correct.

10  THE COURT:  As actually appointed.  No issue with you

11  arguing here.  Can I hold off on the motion until the letters

12  are issued?

13  MR. BOUCHARD:  That's fine with me.  I don't take any

14  issue with that.

15  THE COURT:  All right.  And then my other question

16  related to consolidation.  Is there a reason why you all

17  didn't move to consolidate this?

18  MR. BOUCHARD:  So good question.  I was not a lawyer

19  involved with the initial filing.  I came on later.  The

20  cases, I think, should remain separate to keep it short, even

21  though I recognize the burden, and I apologize.  We certainly

22  feel the burden too of briefing five different times, but I

23  think the cases are different enough, the damages are

24  different enough.  Obviously, there are overlapping facts, but

25  there are also some seriously distinguishing circumstances,

1  including Marcus Sims having died.

2  THE COURT:  All right.  So your position is trial, if

3  we got there, would be five separate trials?

4  MR. BOUCHARD:  My position is that the first case to

5  try should be the death case, Marcus Sims case, because I

6  think that would be sort of a bellwether for the other four,

7  and I think most likely if Marcus Sims' case went to verdict,

8  one way or the other it would probably strongly dictate what

9  happens with the other four.

10  THE COURT:  Okay.  All right.

11  MR. BOUCHARD:  Whereas if we went a different order,

12  I don't think it would because we'd still have to try the

13  death case.

14  THE COURT:  All right.  Thank you.  That is helpful.

15  MR. BOUCHARD:  Thank you, your Honor.

16  MR. CLAYTON:  Your Honor, just very briefly --

17  THE COURT:  Well, hold on a second.  Let him get set

18  up, and then you come on up to the podium.

19  (Brief Pause.)

20  MR. CLAYTON:  So, your Honor, very briefly, to touch

21  on the attorney's fees and the punitives, we had a reasonable

22  security plan.  We had 40, 50 hours of coverage of the hundred

23  that we were trying to cover, including overnight shifts, that

24  week and the weeks leading up to it.

25  Just to put the timing in question here because,

1   again, it all goes into it, COVID in March 2020.  There was on

2   May 29th Atlanta started having protests arising out of George

3   Floyd.  Rayshard Brooks was June 12th.  This was that month

4   when everything was going on.

5          So this is not a situation while, yes, Covid was

6   there and causing issues, it's not like this happened in a

7   vacuum where we didn't have coverage.  But we agree that if

8   your Honor finds this drive-by shooting foreseeable, that

9   would be the first Court that's ever done it in the country

10  that we can find.  Georgia Court of Appeals said no.  New

11  Jersey said no.  Michigan said no.  No one disputes that,

12  because under the totality of the circumstances, drive-bys are

13  different.

14         Yes, of course, you have to look at the totality of

15  the circumstances, but you also have to get into, obviously,

16  proximate cause.  I don't want to get into everything unless

17  you want me to, but, for instance, the CDI thing, that was a

18  different security company when we were hiring Plaza in 2019.

19  That has nothing to do with this because our security plan was

20  reasonable.

21         So this is about filling shifts overnight with APD

22  officers when we're paying an APD corporal or major -- I can't

23  remember which one -- to actually help us fill all of these

24  shifts because if you do not have police power, if you do not

25  have arrest power in this jurisdiction, all you can do is call

1 people.  But even on the city road and sidewalks you
2 couldn't -- an APD officer could if they saw a crime, but
3 private security could do nothing.
4      Yes, proximate cause is normally left to a jury, but
5 as I mentioned, the *Hillcrest* case, difficult to imagine what
6 effective acts the owner could have reasonably taken which
7 could have prevented a drive-by shooting even if there had
8 been a prior such event.  That's exactly what proximate cause
9 is.  You can't do anything to prevent it.
10      Now, your Honor correctly pointed out when he raised,
11 well, they could put a sign up or this.  No expert has said
12 you needed to do that.  No one said you need to have an
13 officer on this corner 24/7.  In fact, our security plan
14 didn't call for that, and it was, in fact, reasonable.
15      THE COURT:  Hold on.  Your security plan is from
16 2019?
17      MR. CLAYTON:  So, yes, we came up with -- we hired a
18 security consultant that then -- that's certified security
19 consultant.  They then sent out requests.  They then got
20 proposals from Plaza Security and another company.  They then
21 walked us through the process, and we figured out what we were
22 going to do.  Then with the assistance of the expert back
23 in -- I don't know if it was 2018 or 2019, we put into effect
24 a security plan, and the security plan included off-duty APD
25 officers from the area patrolling the area.

1          That was part of it, but that wasn't all of it

2    because we had two full-time Plaza Security officers who were

3    working out there.  We did issues with evictions and

4    following -- it's interesting because every single week we had

5    the APD crime reports sent to us so we would know what's going

6    on but, also, so if we had tenants involved in any criminal

7    activities, we could take measures to do that.  So we were not

8    willfully blind.  We were doing everything we could to try to

9    figure this out.

10          But, again, through no -- there was no ability to

11   foresee COVID happening, the incidents and the protests and

12   everything dealing with George Floyd and Rayshard Brooks.

13   This isn't something where you can define this happening.

14          THE COURT:  I hear you, but, I mean, to me that feels

15   like the jury should hear all of that and decide it.

16          MR. CLAYTON:  But again I go back to, your Honor,

17   where is the evidence that there was an officer available?

18   Who could we have called?  What number should we have called?

19   What could we have done?  Was there an available officer in

20   the city of Atlanta to fill that shift?  There's no evidence

21   there is.  There's evidence we tried and tried and tried and

22   tried to do it.

23          Was one available?  Because, again, they were all

24   having their leave cancelled, vacation cancelled.  They were

25   not able to do anything.  Yes, they were having staffing

1  issues leading into this, but then every available officer was

2  called in so they couldn't do it.

3         So without that evidence is a jury to say maybe they

4  could have called somebody?  I don't know who you call.  We

5  had an actual APD manager being paid by us weekly to fill

6  these slots, and the APD manager being paid by us to do this

7  was incapable of doing that.  That is undisputed.

8         So what would we have to do?  I will note -- and it's

9  in the record -- they actually disclosed an expert to say

10 there was security available, and then that expert got

11 withdrawn.  There is no evidence.  So a jury cannot do that.

12 But even if there was one available, it's not to sit on the

13 corner.  It's a roving patrol.  So you get back to the unique

14 situation of proximate cause of a drive-by shooting.

15        So respectfully, your Honor, we would say that there

16 is no evidence.  It is undisputed that there is the lack of

17 evidence.  Is it possible there's an officer out there?  Yeah,

18 I can speculate that maybe there was somewhere.  But the APD

19 manager couldn't fill the slot, and there's no evidence that

20 anyone else could.

21        The question -- we have multiple different avenues to

22 get to summary judgment, and we believe that the undisputed

23 evidence gets us there, as we point out in our briefs.  Are

24 there questions of fact in these cases about various things?

25 Yes.  But questions about why doesn't mean we can't get

1   summary judgment because of the X issues.  So they're pointing

2   to a lot of different things, and we were very meticulous in

3   how we structure summary judgment motions, to avoid questions

4   of fact because we don't think you need to get there in order

5   to do it.

6          If your Honor doesn't have anymore questions, I don't

7   want to belabor.

8          THE COURT:  What is your position or response to what

9   Mr. Bouchard said about consolidation?

10          MR. CLAYTON:  We would be fine consolidating it, your

11   Honor.  I don't want to swear to it because it did predate

12   Mr. Bouchard, which means it was a long time ago.  I believe

13   that the plaintiffs' counsel at the time was not agreeable to

14   doing it, but I did not want to say for sure.  I believe that

15   defendants would be amenable to consolidating the cases for a

16   trial, but I don't know the date on --

17          THE COURT:  No, you're hoping we don't get there

18   so --

19          MR. CLAYTON:  Yeah, exactly, we don't get there.  I

20   don't remember the date on these cases, but, honestly, your

21   Honor, I wouldn't want to -- it's been so long since we had

22   those discussions at the Rule 26 conference that, you know --

23   I'd be happy to have those conversations with Mr. Bouchard,

24   and we'd be happy to make it clear.  And we could do anything,

25   if necessary.

1          As to Mr. Sims being the first one, this goes back to

2     the multiple layers.  Mr. Sims was shot in a drive-by shooting

3     in this location one year earlier.  Clearly he had intimate

4     knowledge of the danger out there, so we wouldn't think his

5     would go first because even if they get past this

6     preventability and foreseeability, which we don't think they

7     would, the status matters.  And Mr. Long and Mr. Sims's cases

8     should fail on the trespasser issue alone, which, again,

9     doesn't apply to the other three; right?  So even when you

10    kind of go down the order of things that are still ones that

11    apply to others, which is why Ms. Woodrick argued some of the

12    very specific ones, and I was here prepared to argue the

13    general ones.

14          We'd be happy to talk about that, your Honor, if

15    anything survives.

16          THE COURT:  All right.  Well, thank you all.

17          This has been very helpful.  There's a lot to piece

18    through.  And so I appreciate you all answering my questions,

19    and I'll take it under advisement, get your decision as soon

20    as I can.

21          MR. BOUCHARD:  Thank you, your Honor.

22          MR. CLAYTON:  Thank you, your Honor.

23          MR. REYNOLDS:  Thank you, your Honor.

24          MS. WOODRICK:  Thank you.

25          COURTROOM SECURITY OFFICER:  All rise.

1          (Whereupon, the proceedings were adjourned at 11:30

2   a.m.)

3                          –   –   –

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    REPORTERS CERTIFICATE

2

3

4           I, Wynette C. Blathers, Official Court Reporter for

5   the United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7           That I reported on the Stenograph machine the

8   proceedings held in open court on May 20, 2025, in the matter

9   of KEIONTAY DAVIS v. WINGATE MANAGEMENT COMPANY, LLC, Case No.

10  1:22-CV-01692-VMC; that said proceedings in connection with

11  the hearing were reduced to typewritten form by me; and that

12  the foregoing transcript (Pages 1  through 55) is a true and

13  accurate record of the proceedings.

14          This the 5th day of December, 2025.

15

16

17

18                        _____
                      /s/ Wynette C. Blathers, RMR, CRR
19                        Official Court Reporter

20

21

22

23

24

25
```

**COURTROOM SECURITY**
**OFFICER: [2]** 3/6 54/25
**MR. BOUCHARD: [19]** 3/16 3/23
23/10 23/12 23/17 36/20 36/24 37/20
45/3 45/7 45/9 46/4 47/9 47/13 47/18
48/4 48/11 48/15 54/21
**MR. CLAYTON: [15]** 3/24 4/5 4/25
5/4 14/18 16/19 19/16 23/9 48/16
48/20 50/17 51/16 53/10 53/19 54/22
**MR. REYNOLDS: [1]** 54/23
**MS. EKPO: [1]** 3/22
**MS. WOODRICK: [16]** 4/2 5/10 5/18
5/21 6/21 7/4 7/13 9/15 10/5 10/8
10/13 10/18 13/19 14/13 14/17 54/24
**THE COURT: [44]** 3/10 3/21 4/1 4/3
4/18 5/2 5/9 5/16 5/20 6/19 7/3 7/11
9/13 10/3 10/6 10/12 10/16 13/15
14/12 14/16 16/17 19/11 23/7 23/11
23/16 36/17 36/23 37/17 44/23 45/4
45/8 45/25 47/4 47/10 47/15 48/2
48/10 48/14 48/17 50/15 51/14 53/8
53/17 54/16

**-**
**-2 [1]** 34/18
**-3 [1]** 38/24

**/**
**/s [1]** 56/18

**1**
**101 [1]** 31/18
**10:05 [1]** 3/3
**1100 [1]** 2/8
**11:30 [1]** 55/1
**120 [1]** 46/18
**12th [1]** 49/3
**14 [2]** 24/6 40/9
**1547 [1]** 1/22
**1600 [1]** 2/12
**1692 [1]** 3/13
**1696 [1]** 3/14
**17th [1]** 2/11
**1923 [1]** 33/12
**1:22-CV-01692-VMC [2]** 1/6 56/10
**1:22-CV-01696-VMC [1]** 1/7
**1:22-CV-1696 [1]** 3/14

**2**
**20 [3]** 1/14 3/2 56/8
**200 [1]** 37/24
**2013 [2]** 5/25 6/3
**2016 [1]** 6/6
**2017 [2]** 27/12 40/12
**2018 [3]** 12/21 31/19 50/23
**2019 [6]** 11/3 12/4 31/19 49/18 50/16
50/23
**2020 [21]** 5/25 12/12 12/22 20/7 24/2
24/7 24/19 24/20 24/22 25/3 25/5
25/11 25/17 25/24 26/10 42/3 42/16
44/4 46/6 46/12 49/1
**2021 [1]** 28/21
**2022 [1]** 12/21
**2023 [1]** 29/1

**2024 [1]** 28/15
**2025 [4]** 1/14 3/2 56/8 56/14
**2114 [1]** 1/20
**215-1547 [1]** 1/22
**229 [1]** 2/4
**23rd [1]** 44/4
**24-hour [1]** 18/10
**24-seven [1]** 19/19
**24/7 [1]** 50/13
**2500 [1]** 2/4
**26 [1]** 53/22
**271 [1]** 2/11
**27th [1]** 11/3
**29th [7]** 24/2 25/14 25/17 26/16 40/25
42/23 49/2

**3**
**30 [2]** 25/7 41/4
**30303 [1]** 1/21 2/5
**30326 [1]** 2/8
**30363 [1]** 2/12
**30th [1]** 42/23
**3390 [1]** 2/7
**3:00 [1]** 11/4

**4**
**40 [1]** 48/22
**404 [1]** 1/22
**464 [1]** 31/18
**4th [3]** 24/22 25/3 25/5

**5**
**50 [1]** 48/22
**51-3-1 [4]** 30/3 32/23 34/17 38/24
**55 [1]** 56/12
**56.1 [2]** 30/22 30/25
**5th [1]** 56/14

**6**
**6-second [2]** 17/4 18/12
**639 [13]** 24/3 24/3 24/6 24/10 24/12
24/15 24/17 25/18 26/7 26/23 35/20
35/22 44/5
**645 [2]** 32/14 33/24
**6th [1]** 46/14

**7**
**700 [1]** 17/17
**75 [1]** 1/21

**9**
**90 [1]** 1/3

**A**
**a.m [2]** 3/3 55/2
**abiding [1]** 32/7
**ability [2]** 13/23 51/10
**abreast [1]** 14/1
**abstract [1]** 38/5
**accompanied [2]** 9/5 9/19
**according [3]** 24/8 24/11 24/13
**acknowledge [1]** 18/10
**act [12]** 15/22 17/10 19/8 29/2 34/25
35/21 35/23 36/6 36/22 38/11 39/22
39/24

**acted [1]** 41/1
**acting [1]** 46/3
**ACTION [1]** 1/6
**actions [1]** 12/15
**actively [2]** 29/21 38/19
**activities [1]** 51/7
**acts [5]** 11/10 18/17 39/10 40/17 50/6
**add [1]** 29/18
**addition [2]** 11/13 17/13
**address [10]** 4/12 4/14 10/10 10/13
10/14 14/18 23/5 23/24 25/15 34/15
**addresses [3]** 4/13 23/14 31/18
**adequate [1]** 46/18
**adjacent [2]** 24/10 26/7
**adjourned [1]** 55/1
**admits [1]** 16/23
**advisement [1]** 54/19
**affidavit [1]** 25/25
**affidavits [1]** 45/19
**agreeable [1]** 53/13
**agreement [1]** 31/6
**Ahmad [2]** 37/22 42/1
**Ahmad's [1]** 40/22
**aided [1]** 1/18
**Alanna [1]** 46/21
**alarm [1]** 32/9
**alleged [2]** 31/8 31/15
**allocated [2]** 18/3 19/22
**allotted [1]** 23/20
**allow [3]** 7/9 9/24 23/4
**allowed [1]** 37/3
**allowing [1]** 36/20
**allows [1]** 32/25
**almost [1]** 12/21
**alone [5]** 32/11 32/19 47/2 47/2 54/8
**amenable [1]** 53/15
**amenity [1]** 34/4
**analysis [7]** 5/13 7/5 10/9 10/24 11/6
13/24 29/10
**answer [9]** 5/4 5/5 14/15 14/21 23/4
23/7 34/17 42/10 45/3
**anticipate [2]** 43/16 44/2
**anticipated [2]** 24/12 40/10
**anticipates [1]** 40/17
**anymore [1]** 53/6
**apartment [6]** 8/6 9/3 31/18 35/2 35/6
**APD [42]** 6/24 7/2 17/16 18/3 19/12
19/21 19/22 20/2 20/2 21/19 24/21
24/22 24/24 25/1 25/3 25/4 25/6 25/8
26/9 37/13 38/19 38/21 39/1 41/7
41/9 41/17 41/17 41/21 41/22 42/14
46/6 46/9 46/10 46/15 49/21 49/22
50/2 50/24 51/5 52/5 52/6 52/18
**APD's [3]** 6/2 24/21 38/23
**apologize [3]** 4/25 26/1 47/21
**Appeals [8]** 15/19 17/10 18/20 28/17
34/20 38/14 39/21 49/10
**appearance [1]** 3/20
**appearances [2]** 1/22 3/14
**applicability [1]** 10/11
**applied [2]** 25/2 25/3
**applies [4]** 35/9 38/10 38/16 38/17
**apply [6]** 5/13 5/21 28/1 33/23 54/9
54/11
**applying [1]** 28/1

**A**

appointed [1] 47/10
appreciate [1] 54/18
appreciation [1] 14/10
area [41] 7/17 7/18 8/21 9/10 9/21
10/21 10/22 11/14 11/15 12/14 12/16
13/12 14/2 14/2 14/4 16/24 19/15
21/4 24/4 25/16 26/7 26/11 26/14
26/23 30/1 30/5 30/10 35/19 35/20
36/11 36/21 37/5 40/8 40/20 44/25
45/11 45/13 45/14 46/22 50/25 50/25
areas [3] 30/18 31/3 35/19
aren't [1] 19/11
arguably [1] 35/7
argue [2] 40/6 54/12
argued [2] 30/15 54/11
arguing [4] 29/17 36/7 37/17 47/11
argument [14] 3/11 22/10 27/16
27/17 27/17 27/18 29/19 30/14 30/19
31/24 34/16 38/22 42/6 42/10
arguments [4] 5/3 31/20 37/19 39/11
arise [1] 14/14
arising [1] 49/2
armed [3] 35/2 35/7 41/15
arrest [5] 5/25 6/8 6/25 12/13 49/25
arrested [6] 5/18 6/5 6/15 7/1 21/18
21/19
arrests [2] 12/15 12/24
assailant's [1] 44/13
assailants [2] 35/12 44/16
assess [1] 39/17
assistance [1] 50/22
assume [1] 31/24
ate [1] 26/25
Atkinson [1] 2/11
ATLANTA [15] 1/2 1/21 2/5 2/8 2/12
3/8 3/17 18/3 20/5 28/16 30/13 45/13
49/2 51/20 56/6
attached [3] 1/4 31/9 31/11
attaching [1] 1/7
attendant [1] 12/25
Attorney [1] 2/6
attorney's [2] 46/1 48/21
Attorneys [2] 2/3 2/10
attract [1] 26/5
authority [1] 19/4
avenues [1] 52/21
avoid [3] 13/23 14/11 53/3
awareness [3] 12/16 12/25 13/13
axiomatic [1] 40/12

**B**

background [1] 13/13
base [2] 46/22 46/23
basement [1] 33/16
basic [1] 46/23
basis [2] 32/22 47/1
Bedford [25] 11/15 13/1 13/3 13/4
13/9 24/3 25/5 25/13 26/16 26/20
26/21 28/12 29/24 29/25 30/1 30/5
30/5 30/6 34/5 35/24 36/2 36/4 44/14
44/16 44/21
beforehand [1] 15/5
belabor [1] 53/7

**B** (continued)

bellwether [1] 48/6
below [1] 31/14
beneficial [1] 28/4
benefit [1] 34/4
Bethany [7] 28/24 34/19 34/19 35/1
35/3 35/4 35/9
beyond [3] 16/8 27/6 32/21
Bianco [3] 24/11 41/4 41/9
bids [1] 42/15
bill [1] 42/3
binding [2] 34/20 39/9
black [1] 26/2
BLATHERS [1] 1/19 56/4 56/18
blind [1] 51/8
block [15] 8/19 10/22 11/14 11/20
12/2 12/4 12/9 12/19 12/22 15/4 15/6
17/25 21/5 27/1 35/19
boiler [5] 33/15 33/20 33/21 33/21
33/22
bottom [2] 32/12 41/11
BOUCHARD [7] 2/2 3/17 23/5 23/18
53/9 53/12 53/23
Boulevard [2] 17/18 31/18
bound [2] 31/12 31/22
Brantley [1] 2/11
breached [1] 35/4
brewing [2] 40/5 40/11
brief [7] 30/15 30/23 31/9 31/11 33/7
39/11 48/19
briefing [3] 40/2 43/4 47/22
briefs [3] 17/2 23/22 52/23
Brooks [2] 49/3 51/12
brother [4] 13/3 13/4 13/6 13/11
build [1] 20/18
building [13] 6/9 8/7 8/15 8/16 8/18
9/6 9/9 9/22 9/22 9/25 13/2 13/3
20/24
buildings [9] 7/25 8/1 8/3 8/12 8/13
9/11 13/4 17/20 24/10
bullet [2] 20/17 36/9
bullets [3] 24/9 35/22 36/5
bunch [1] 39/11
burden [2] 47/21 47/22
bypass [1] 38/10
bys [2] 16/17 49/12
bystander [1] 10/4

**C**

CALVERT [2] 1/12 3/9
cameras [2] 21/2 21/3
cancelled [2] 51/24 51/24
car [4] 17/4 17/7 19/5 22/5
Carmichael [12] 13/20 15/10 21/12
29/9 39/9 39/16 39/19 39/21 39/24
40/5 43/1 43/17
cars [2] 13/10 26/25
causation [1] 21/10
CDI [6] 41/6 41/7 41/12 41/14 41/16
49/17
CERTIFICATE [1] 56/1
certified [2] 41/20 50/18
certify [1] 56/6
challenges [1] 25/8
Cham [2] 28/21 30/13
characterized [1] 43/14

**C** (continued)

charged [1] 32/11
Charles [2] 37/22 40/21
cherrypicked [1] 27/20
cherrypicks [1] 27/18
chest [1] 11/2
chief [1] 25/22
circumstances [14] 15/12 15/17 16/9
28/23 29/20 32/8 39/18 40/4 43/19
43/23 44/6 47/25 49/12 49/15
cite [4] 1/4 33/8 40/21 41/3
cited [6] 16/12 16/12 16/14 20/16
32/11 33/8
cites [3] 39/19 39/20 39/23
citing [3] 29/14 30/13 43/9
city [13] 8/2 17/20 17/20 17/21 17/21
18/3 18/25 18/25 19/3 19/7 20/5 50/1
51/20
CIVIL [1] 1/6
claimed [1] 8/23
claims [1] 8/18
Clark [2] 28/16 30/13
CLAYTON [6] 2/10 3/24 10/9 13/16
27/16 39/6
clear [4] 4/19 35/22 41/12 53/24
client's [2] 44/24 44/25
clients [1] 45/5
close [2] 11/16 12/3
closed [1] 8/8
CM [2] 1/2 1/3
CM/ECF [1] 1/2 1/3
co [1] 3/19
co-counsel [1] 3/19
code [1] 32/5
commercial [2] 8/1 8/12
commit [1] 19/8
common [12] 9/21 21/24 26/7 26/22
28/8 28/8 28/9 30/1 30/5 30/18 31/3
35/18
commonplace [1] 13/5
community [3] 7/24 35/2 35/6
company [6] 1/7 3/13 14/6 49/18
50/20 56/9
comparative [2] 29/9 43/3
complex [1] 17/19
computer [1] 1/18
computer-aided [1] 1/18
concepts [1] 40/18
concern [3] 31/19 31/20 32/9
concerns [1] 31/16
conclusion [1] 15/18
concurrence [1] 13/20
condition [1] 4/23
conditions [2] 38/15 38/17
conduct [2] 22/4 22/11
conference [1] 53/22
configuration [1] 7/24
confirming [1] 25/8
conflicting [1] 28/13
conflicts [2] 30/8 30/10
confront [1] 19/8
congregate [1] 26/6
congregated [1] 33/25
congregating [1] 25/23
conjecture [1] 22/23
connection [1] 56/10

**C**

conscious [1]  46/5
considerations [1]  4/24
consistent [1]  33/4
consolidate [1]  47/17
consolidating [2]  53/10 53/15
consolidation [2]  47/16 53/9
constructive [1]  34/1
construe [1]  28/2
consultant [3]  6/23 50/18 50/19
contend [6]  5/14 7/4 9/15 9/16 10/1
  10/19
context [3]  15/9 16/14 37/21
continued [1]  6/3
contract [7]  31/8 31/13 31/13 31/15
  31/25 32/4 32/5
contractual [2]  31/6 31/21
contradictory [1]  8/25
contrary [1]  16/13
control [1]  19/10
convictions [2]  12/15 12/24
corner [1]  50/13 52/13
corporal [1]  49/22
corporate [2]  24/11 41/4
cotton [6]  28/20 33/11 33/12 33/14
  33/15 33/16
country [2]  15/20 49/9
court [53]  1/2 1/6 1/8 1/1 1/20 3/7
  15/19 17/9 18/16 18/20 21/10 23/24
  27/8 27/12 28/7 28/17 28/22 28/24
  29/1 29/11 30/22 32/2 32/18 32/21
  33/9 33/17 34/12 34/19 35/1 35/3
  38/12 38/13 38/14 39/17 39/20 40/13
  40/21 41/3 42/9 43/1 43/7 43/12
  43/19 43/20 44/3 45/9 45/23 49/9
  49/10 56/4 56/5 56/8 56/19
Court's [3]  23/12 23/14 23/25
courthouse [1]  1/20 37/23
courts [2]  16/11 17/9
cover [3]  18/1 23/21 48/23
coverage [5]  18/10 19/21 19/21
  48/22 49/7
covered [2]  18/4 35/17
COVID [6]  18/2 19/23 20/4 49/1 49/5
  51/11
create [1]  32/19
created [1]  24/19
creates [3]  32/11 34/9 34/11
crime [18]  10/20 10/21 11/19 12/5
  12/16 13/5 14/2 14/24 16/22 16/24
  17/2 24/5 35/21 45/1 45/11 45/13
  50/2 51/5
crimes [1]  20/16
criminal [13]  5/18 6/1 6/2 6/3 6/11
  6/22 6/24 6/25 11/10 39/10 39/22
  40/17 51/6
criminally [3]  5/24 6/5 6/5
criminologist [1]  37/24
criticism [2]  38/2 38/3
CRR [2]  1/19 56/18
custom [2]  27/4 33/14
customers [1]  38/16
CV [5]  1/6 1/7 3/13 3/14 56/10
CVS [7]  28/25 29/8 39/9 39/16 39/19

43/1 43/17
Cynthia [2]  24/11 41/4

**D**

damages [3]  45/25 47/2 47/23
dancing [1]  37/4
danger [3]  12/17 36/18 54/4
dangerous [11]  4/23 12/7 12/23
  34/25 35/21 35/23 36/6 36/22 38/15
  38/17 45/15
dangers [1]  24/15
DAVID [3]  2/2 3/16 23/18
DAVIS [6]  1/4 3/12 8/17 13/1 13/8
  56/9
Davis's [1]  47/6
deadline [1]  5/22
dealt [1]  15/8
death [3]  47/6 48/5 48/13
deceased [1]  33/20
decedent [1]  11/1
December [1]  56/14
decide [4]  22/19 29/11 43/7 51/15
decided [2]  18/14 28/15
decision [1]  54/19
declaration [1]  6/8
defendant [7]  1/8 2/9 3/25 4/4 4/8
  13/21 33/19
defendant's [2]  5/11 31/1
defendants [3]  5/14 46/3 53/15
defense [8]  23/15 23/21 28/3 28/5
  31/9 35/25 37/17 39/11
defense's [2]  27/19 27/20
defies [1]  43/17
defined [1]  32/3
definition [3]  9/21 32/2 32/4
DeKalb [1]  19/12
deliberate [1]  15/22
demonstrates [1]  26/20
demonstrations [1]  41/21
denied [2]  22/15 27/17
depending [1]  4/14
deposition [1]  25/25
depositions [1]  45/20
deputy [1]  37/23
despite [2]  22/13 39/6
details [1]  45/5
deterred [1]  35/12
development [1]  25/22
dictate [1]  48/8
died [1]  48/1
differences [1]  22/1
difficult [7]  15/1 15/15 18/17 27/5
  43/15 44/10 50/5
difficulty [1]  24/21
diminished [1]  41/17
direct [2]  28/24 38/12
director [1]  41/13
disallowed [1]  7/18
disclosed [1]  52/9
discount [1]  7/22
discussions [1]  53/22
disperse [3]  35/13 36/14 42/21
dispositive [1]  11/24
dispute [2]  9/13 18/24
disputes [1]  49/11

distinguishing [1]  47/25
DISTRICT [6]  1/1 1/1 3/7 3/7 56/5
  56/5
division [3]  1/2 3/8 5/3
docket [1]  1/5
document [1]  1/8
documents [4]  6/13 7/9 9/12 9/24
DOUGLAS [1]  2/10
Dr. [2]  37/23 40/22
Dr. Gray's [1]  40/22
Dr. Jane [1]  37/23
drawn [3]  25/10 26/22 27/11
drew [1]  13/10
drinks [3]  26/5 26/6 34/4
drive-by [33]  10/10 11/2 12/1 14/25
  15/3 15/5 15/8 15/13 15/17 15/21
  16/4 16/6 16/10 16/13 16/20 16/25
  17/4 18/16 18/19 18/21 21/5 21/15
  24/6 39/20 39/23 40/8 43/14 43/21
  44/5 49/8 50/7 52/14 54/2
drive-bys [2]  16/17 49/12
driver [2]  35/1 35/8
drivers [1]  35/5
drone [1]  23/3
drove [3]  17/3 24/9 26/25
drug [1]  12/24
Dumbaugh [4]  17/15 37/25 37/25
  42/1
Dumbaugh's [1]  40/24
duty [27]  10/5 10/15 14/14 20/23
  21/23 25/3 25/4 25/4 25/9 25/10
  25/10 28/12 28/22 29/20 32/20 32/23
  34/14 35/4 38/24 38/25 39/1 41/17
  46/9 46/10 46/23 50/24

**E**

eat [1]  8/10
eating [1]  37/4
ECF [2]  1/2 1/3
effect [1]  50/23
effective [2]  18/17 50/6
egress [1]  8/16
EKPO [3]  2/2 3/19 23/19
Elizabeth [3]  37/25 37/25 40/23
Ellington [1]  29/14
else's [2]  24/16 24/18
emerge [1]  44/15
emphasize [1]  39/19
encounter [1]  18/12
enforce [3]  6/24 36/15 42/21
enjoyed [2]  34/8 34/9
entrance [1]  8/20
entry [2]  1/5 33/3
environment [2]  12/7 12/23
equal [4]  10/19 13/17 29/12 43/8
especially [1]  31/13
essentially [2]  12/7 12/20
established [1]  43/6
evening [1]  18/9
event [5]  18/19 44/9 44/10 44/19 50/8
events [1]  43/15
everyone [4]  3/11 14/25 16/1 19/4
everywhere [1]  45/12
evictions [1]  51/3
evidence [31]  8/24 19/25 20/8 20/9

## E

**evidence... [27]** 20/21 21/6 22/13 22/16 25/19 26/19 27/5 27/13 28/13 29/5 32/13 33/17 35/11 35/18 39/5 40/3 41/3 44/11 51/17 51/20 51/21 52/3 52/11 52/16 52/17 52/19 52/23
**evidenced [1]** 12/13
**exclude [2]** 6/14 6/20
**excuse [1]** 4/9
**exercise [3]** 29/10 34/22 38/5
**exercised [1]** 29/14
**experienced [1]** 11/11
**expert [15]** 11/22 16/23 17/14 24/13 37/10 37/17 37/24 37/25 40/22 40/23 40/24 50/11 50/22 52/9 52/10
**experts [4]** 36/8 37/21 40/24 42/1
**expire [1]** 6/12
**explicitly [1]** 39/18
**exploded [1]** 33/21
**express [6]** 29/17 29/23 32/18 32/21 34/11 34/13
**extended [2]** 31/10 36/21
**extensive [2]** 24/5 32/13
**extent [1]** 44/9
**extremely [1]** 43/15

## F

**fact [19]** 9/13 14/5 15/12 15/13 22/12 25/19 30/23 31/8 32/1 34/5 34/9 35/4 39/5 39/25 44/3 50/13 50/14 52/24 53/4
**factor [1]** 13/21
**facts [19]** 5/12 7/6 7/21 10/1 10/24 15/23 17/1 27/9 27/19 27/20 27/22 28/1 28/2 28/3 30/24 31/1 43/3 46/1 47/24
**factual [2]** 29/10 30/7
**fail [1]** 54/8
**failed [2]** 36/18 42/20
**failure [3]** 38/14 40/19 47/2
**faith [1]** 46/3
**fall [1]** 11/6
**falls [2]** 30/20 31/23
**familiarity [1]** 44/25
**family [1]** 36/2
**favor [1]** 27/11
**favorable [2]** 27/10 28/2
**fees [2]** 46/1 48/21
**figure [3]** 9/14 22/15 51/9
**FILE [1]** 1/6
**fill [5]** 20/3 49/23 51/20 52/5 52/19
**filled [3]** 19/18 19/24 20/1
**filling [1]** 49/21
**final [1]** 43/11
**Finally [1]** 13/1
**Finch [2]** 2/3 3/17
**finder [1]** 39/25
**firearm [1]** 6/9
**firearms [1]** 6/16
**fit [1]** 42/3
**fix [1]** 46/19
**flat [2]** 30/20 31/23
**Floyd [2]** 49/3 51/12
**flying [1]** 35/22

## G

**focus [1]** 39/14
**folks [6]** 16/5 30/15 36/20 37/3 40/7 46/23
**food [8]** 26/4 26/5 26/6 33/5 34/3 34/8 34/8 45/15
**Foods [1]** 21/9
**foot [2]** 19/2 21/20
**footage [2]** 27/3 44/6 44/12
**footnote [2]** 29/8 42/25
**forbidding [1]** 31/5
**foregoing [1]** 56/12
**foreknowledge [1]** 43/25
**foresee [1]** 51/11
**foreseeability [14]** 10/10 11/21 21/12 21/22 22/24 28/25 39/8 39/10 39/17 40/3 40/15 43/18 44/1 54/6
**foreseeable [15]** 11/22 11/23 15/16 15/21 16/2 16/2 16/4 16/8 16/14 17/13 21/7 29/2 39/25 44/19 49/8
**forewarning [6]** 15/2 15/2 16/1 16/19 43/16 43/22
**forget [1]** 47/8
**form [1]** 56/11
**foundation [1]** 21/3
**four-month [1]** 46/11
**frankly [1]** 46/13
**frequency [1]** 24/17
**frequent [1]** 26/23
**friend [2]** 8/5 12/3
**friends [2]** 8/10 11/16
**front [2]** 9/9 45/16
**full-time [1]** 51/2

## G

**gas [2]** 12/3 38/13
**gates [1]** 36/9
**gather [1]** 36/21
**gathered [3]** 32/14 35/18 40/7
**gathering [3]** 35/14 36/11 42/22
**gatherings [2]** 26/11 26/23
**general [7]** 10/10 16/24 17/2 18/15 40/9 45/6 54/13
**gentlemen [2]** 6/15 14/23
**George [2]** 49/2 51/12
**GEORGIA [40]** 1/1 1/21 2/5 2/8 2/12 3/8 3/18 15/9 15/18 16/15 17/9 18/20 20/23 27/12 28/17 28/22 28/25 29/1 32/2 32/5 32/17 32/24 34/19 34/21 38/14 39/8 39/9 39/14 39/16 39/17 39/19 39/20 40/12 41/20 43/1 43/1 43/17 43/20 49/10 56/6
**gets [2]** 25/6 52/23
**ginned [1]** 33/16
**ginnery [1]** 33/14
**ginnery's [1]** 33/15
**girlfriend [1]** 34/7
**glass [1]** 20/17
**gotten [1]** 22/20
**governs [1]** 39/9
**granted [2]** 21/9 27/21
**granting [1]** 47/7
**grassy [4]** 7/17 7/18 9/10 36/12
**Gray [2]** 37/23 42/2
**Gray's [1]** 40/22
**great [1]** 32/3

## H

**grill [1]** 26/5
**Grobman [1]** 35/8
**grounds [1]** 13/7
**group [2]** 2/7 16/7
**Groussman [1]** 24/13
**grown [3]** 11/14 11/15 12/5
**guard [3]** 36/25 37/9 37/10
**guards [3]** 35/11 41/2 42/19
**guests [2]** 7/10 38/17
**gun [4]** 12/17 13/10 13/12 24/17
**guns [2]** 12/14 24/9

## H

**hammer [1]** 35/25
**hang [2]** 8/10 9/9
**hanging [1]** 37/4
**happy [7]** 4/12 14/14 23/23 45/24 53/23 53/24 54/14
**hazard [6]** 11/7 13/22 13/24 14/10 17/3 17/3
**He'd [1]** 11/14
**hearing [2]** 1/8 56/11
**heeded [3]** 18/13 35/15 45/18
**helpful [2]** 48/14 54/17
**Here's [1]** 42/5
**hereby [1]** 56/6
**hidden [3]** 34/25 35/21 35/24
**hide [1]** 34/3
**highlighted [1]** 31/14
**highway [1]** 38/11
**Hill [1]** 20/16
**Hillcrest [9]** 10/11 15/9 18/16 21/9 39/13 39/15 39/21 39/23 50/5
**hire [3]** 18/3 20/9 20/10
**hired [1]** 50/17
**hiring [1]** 49/18
**history [4]** 12/23 24/5 26/18 35/20
**hold [3]** 47/11 48/17 50/15
**homes [1]** 8/13
**honestly [2]** 11/9 53/20
**Honor [29]** 3/16 3/24 4/2 4/5 4/11 4/25 5/10 10/18 14/17 23/10 23/17 23/20 27/22 46/5 46/13 48/15 48/16 48/20 49/8 50/10 51/16 52/15 53/6 53/11 53/21 54/14 54/21 54/22 54/23
**HONORABLE [3]** 1/12 3/6 3/8
**hook [1]** 23/13
**hoping [1]** 53/17
**host [1]** 44/15
**hour [5]** 17/6 17/6 18/10 27/4 44/13
**hours [6]** 19/20 20/24 21/1 36/12 36/13 48/22
**house [2]** 31/2 31/21
**housing [1]** 7/24
**human [1]** 37/12
**hundred [3]** 19/20 20/25 48/22
**hundreds [1]** 14/6

## I

**I'd [4]** 13/16 23/19 45/16 53/23
**I'll [3]** 5/13 14/18 54/19
**I'm [18]** 3/18 4/19 10/16 11/18 23/7 23/23 23/24 28/6 29/8 29/14 30/12 30/20 35/9 37/5 39/5 42/24 43/8 45/24

60

## I

I've [4]  30/2 31/14 42/8 42/25
idly [1]  39/3
image [1]  26/2
imagine [3]  18/17 47/1 50/5
immediate [2]  32/9 44/14
immediately [2]  17/8 24/7
implement [1]  46/19
implementation [1]  38/4
implemented [1]  38/4
implied [9]  28/18 29/17 32/22 32/25
  33/19 33/22 34/10 34/12 34/13
impose [1]  20/23
impossible [1]  43/16
inadequate [2]  18/6 38/8
incapable [1]  52/7
incident [7]  14/8 14/9 27/4 44/21
  46/12 46/13 46/14
incidents [2]  45/5 51/11
indifference [1]  46/5
individual [2]  10/24 21/17
individuals [2]  21/18 32/7
inferences [1]  27/10
ingress [1]  8/16
ingress/egress [1]  8/16
inherently [1]  15/1
initial [4]  6/21 8/25 39/12 47/19
injured [1]  12/1
injuries [1]  18/7
inquiry [1]  43/2
inspection [1]  34/1
instance [1]  49/17
instead [1]  17/6
instruction [3]  28/21 32/24 33/10
instructions [2]  33/9 33/9
intend [1]  23/13
intended [3]  10/4 16/5 22/9
intents [1]  33/4
interests [1]  33/4
International [1]  2/4
intimate [1]  54/3
invitation [14]  28/14 28/18 29/23
  30/8 30/11 32/19 32/21 32/22 33/22
  34/10 34/11 34/12 34/13 34/13
invitations [2]  31/10 32/25
invite [1]  33/19
invited [13]  8/11 8/13 8/18 8/18 8/22
  8/23 9/25 26/17 26/19 29/23 30/5
  30/16 31/17
invitees [4]  7/23 29/17 30/4 34/18
involvement [1]  45/1
irrelevant [1]  29/22
issue [14]  6/21 6/23 11/25 28/8 28/11
  31/6 34/5 37/8 42/25 44/8 44/23
  47/10 47/14 54/8
issued [2]  6/24 47/12
issues [13]  4/6 4/7 4/8 14/14 23/6
  28/5 28/9 37/6 38/22 49/6 51/3 52/1
  53/1

## J

Jackson [1]  6/7
Jane [1]  37/23
Jasmine [1]  34/7

Jersey [2]  16/15 49/11
Jewell [3]  28/19 33/11 33/12
Jim [1]  24/8
joined [1]  3/18
Jon [1]  24/13
JR [1]  2/6
Judge [3]  3/9 14/18 23/9 28/14 40/15
  42/6 43/9
judgment [15]  6/17 14/21 21/9 21/25
  22/14 27/8 27/14 27/21 27/24 28/6
  28/9 30/12 52/22 53/1 53/3
jump [1]  4/16
June [16]  11/3 12/11 12/22 20/7 24/2
  24/7 25/14 25/17 26/16 40/25 42/16
  42/23 42/23 44/4 46/12 49/3
June 2020 [3]  24/7 42/16 46/12
June 23rd [1]  44/4
June 27th [1]  11/3
June 29th [6]  24/2 25/14 25/17 26/16
  40/25 42/23
June 30th [1]  42/23
jurisdiction [3]  41/19 41/23 49/25
juror [2]  29/2 40/1
jurors [1]  47/1
jury [26]  9/13 22/15 28/11 28/14
  28/19 28/23 29/2 29/4 29/6 29/13
  30/3 30/11 32/12 32/15 32/19 33/8
  34/10 34/11 40/13 43/5 43/8 46/25
  50/4 51/15 52/3 52/11
justifiable [1]  32/8

## K

KEIONTAY [2]  1/4 56/9
Khalia [1]  38/12
killings [1]  13/9
knowing [1]  45/4
knows [4]  25/11 27/8 33/9 45/9

## L

lack [8]  24/24 25/1 25/2 25/16 35/6
  35/23 42/19 52/16
laid [1]  43/4
landowner [1]  21/10
language [1]  31/13
large [1]  17/19
lately [1]  37/6
LAUREN [2]  2/9 3/25
law [18]  2/3 2/6 2/7 2/10 3/17 15/16
  16/4 20/23 29/11 32/2 32/7 32/17
  32/24 34/20 34/21 39/14 39/15 43/7
layers [1]  54/2
leading [2]  48/24 52/1
leads [2]  38/9 46/2
learning [1]  41/17
lease [11]  6/12 7/9 7/17 9/12 9/23
  30/15 30/17 31/2 31/21 31/25 32/4
led [2]  22/4 22/11
Lee [1]  3/24
legal [1]  10/9
Leigh [1]  28/14
letters [1]  47/11
levels [2]  38/20 39/2
Lewis [6]  26/1 26/3 26/13 33/23
  36/13 37/1
liability [1]  11/24

licensee [2]  7/5 10/2
licensees [7]  4/20 5/12 23/2 28/22
  29/18 34/16 34/19
licensing [1]  5/7
life [1]  12/6
light [2]  27/9 28/2
LLC [4]  1/7 2/7 3/13 56/9
LLP [1]  2/3
Local [1]  30/22
location [4]  11/3 11/5 11/12 54/3
loiter [2]  7/11 30/17
loitering [13]  7/7 7/9 7/12 9/21 9/23
  9/24 31/5 31/22 32/1 32/3 32/11
  32/12 32/16
Long's [1]  8/25
looming [1]  46/8

## M

machine [1]  56/7
maintain [3]  27/4 38/14 38/25
major [2]  24/22 49/22
majority [1]  23/20
manage [1]  38/24
MANAGEMENT [3]  1/7 3/12 56/9
manager [3]  6/23 19/22 24/8 33/25
  46/21 52/5 52/6 52/19
managers [1]  20/2
Manga [1]  34/7
manner [1]  32/7
March [10]  24/19 24/20 24/22 25/3
  25/5 25/11 25/14 46/6 46/14 49/1
March 2020 [5]  24/19 24/20 25/11
  46/6 49/1
March 4th [2]  24/22 25/3
March 6th [1]  46/14
Marcus [4]  36/1 48/1 48/5 48/7
Marie [1]  3/9
Marsh [1]  2/11
marshal [1]  37/23
Mart [2]  28/16 43/9
Martin [2]  28/14 40/15
material [1]  31/1
matter [1]  10/3 14/19 15/16 16/4
  16/5 22/10 29/11 34/16 36/5 43/7
  56/8
matters [1]  54/7
May 29th [1]  49/2
McCranie [2]  2/3 3/17
measures [3]  18/6 46/2 51/7
mechanical [1]  1/18
mechanism [1]  24/22
meeting [1]  24/22
memo [2]  46/6 46/15
memorable [1]  6/8
men [2]  27/1 45/12
menu [1]  37/16
merits [1]  47/5
meticulous [1]  53/2
Michigan [2]  16/15 49/11
middle [1]  18/1
mile [3]  8/6 8/11 17/17
Mill [3]  28/20 33/11 33/12
milling [1]  7/14
miss [1]  13/6
mission [2]  8/5 9/5
monitor [1]  42/21

## M

monitoring [2]  25/18 35/23
month [2]  46/11 49/3
months [4]  21/20 24/7 40/9 42/16
mother [2]  13/3 47/8
motion [6]  1/8 14/20 28/5 39/12 47/5
47/11
motions [1]  53/3
movant's [1]  30/24
Mr. [34]  5/24 6/4 7/1 7/1 8/4 8/17 8/23
8/25 9/1 10/9 11/2 11/2 12/1 12/9
12/19 13/1 13/8 13/16 15/3 16/25
21/19 23/5 27/16 35/8 37/22 39/6
47/6 53/9 53/12 53/23 54/1 54/2 54/7
54/7
Mr. Bouchard [4]  23/5 53/9 53/12
53/23
Mr. Charles [1]  37/22
Mr. Clayton [4]  10/9 13/16 27/16
39/6
Mr. Davis [3]  8/17 13/1 13/8
Mr. Davis's [1]  47/6
Mr. Grobman [1]  35/8
Mr. Long [5]  5/24 7/1 12/1 21/19 54/7
Mr. Long's [1]  8/25
Mr. Newton [4]  6/4 7/1 8/4 12/9
Mr. Phillips [1]  12/19
Mr. Sims [8]  8/23 9/1 11/2 11/2 15/3
16/25 54/1 54/2
Mr. Sims's [1]  54/7
Ms [1]  23/19
Ms. [11]  4/13 4/16 5/5 9/2 15/4 17/15
27/16 36/13 37/1 41/9 54/11
Ms. Bianco [1]  41/9
Ms. Dumbaugh [1]  17/15
Ms. Lewis [2]  36/13 37/1
Ms. Woodrick [5]  4/13 4/16 5/5 15/4
54/11
Ms. Woodrick's [1]  27/16
Ms. Woods' [1]  9/2
multiple [3]  6/16 52/21 54/2
music [1]  26/4

## N

nature [5]  15/18 16/3 17/12 21/15
43/2
NE [1]  2/4
near [2]  6/15 13/6
necessary [2]  44/4 53/25
negligence [6]  25/13 27/9 27/14
38/10 38/12 42/16
negligent [7]  15/9 16/14 29/21 38/7
38/19 40/19 42/11
negligently [2]  41/1 42/20
neighbor's [1]  44/12
neighborhood [1]  24/25
neighboring [1]  12/2
networks [1]  21/4
Newton [4]  6/4 7/1 8/4 12/9
No. [1]  3/13
No. 1:22-CV-1692 [1]  3/13
nobody [1]  25/17
none [3]  20/1 32/10 40/24
NORTHERN [3]  1/1 3/7 56/5

## O

notable [1]  32/25
notice [4]  3/19 25/6 34/1 46/7
notices [1]  37/12
notification [1]  24/21
notwithstanding [1]  44/25
number [3]  1/5 1/5 51/18
NW [1]  2/11

## O

o'clock [1]  11/4
O.C.G.A [1]  30/3
Observe [1]  19/5
obvious [2]  26/15 36/10
off-duty [5]  25/4 25/4 39/1 46/10
50/24
officer [16]  6/7 17/16 18/8 18/14
19/14 20/24 21/19 22/12 22/20 25/22
50/2 50/13 51/17 51/19 52/1 52/17
officer's [1]  6/1
officers [14]  18/4 19/12 19/12 20/6
22/16 25/1 25/2 41/18 41/19 41/20
41/23 49/22 50/25 51/2
offices [1]  56/6
official [7]  1/1 1/1 1/2 1/6 1/20 56/4
56/19
on-duty [3]  25/3 25/10 46/9
on-site [1]  41/8
online [1]  41/8
open [6]  17/7 20/2 26/15 34/2 36/10
56/8
operate [1]  37/3
operated [3]  7/25 32/14 33/24
operating [3]  26/13 26/24 36/13
opined [3]  36/8 40/25 41/1
opinion [3]  40/22 40/23 40/24
opportunity [6]  23/18 23/23 35/13
35/14 36/14 36/15
opposed [2]  14/6 45/5
opposite [1]  27/23
opted [1]  41/13
options [1]  37/16
oral [1]  3/11
order [4]  8/21 48/11 53/4 54/10
ordinary [8]  29/14 29/20 32/20 32/23
34/14 34/23 43/10 46/23
originally [1]  5/24
OTO [3]  2/2 3/19 23/19
outdated [1]  33/13
outdoor [11]  25/20 26/4 26/13 26/24
32/13 33/5 33/24 35/13 36/17 40/7
42/22
outline [1]  34/18
overarching [1]  28/7
overlap [1]  4/7
overlapping [1]  47/24
overlaps [1]  22/1
overnight [3]  18/4 48/23 49/21
owed [8]  10/5 10/15 21/23 21/25
28/13 28/22 29/20 32/23
owned [1]  7/25
owner [6]  14/1 18/18 33/1 33/5 40/16
50/6
owners [1]  19/10

## P

pack [2]  37/1 37/4
page [1]  1/5
Pages [1]  56/12
palpable [1]  27/13
palpably [1]  13/10
paper [1]  38/3
park [1]  26/4
parked [1]  19/14
parking [7]  8/15 8/19 25/21 25/23
26/7 38/13 43/9
parks [1]  8/1
Parkway [14]  17/18 24/3 24/4 24/6
24/9 24/10 24/12 24/15 24/17 25/18
26/7 26/23 35/22 44/5
part [2]  33/11 51/1
partial [1]  1/8
party [5]  11/9 39/10 39/22 39/24
40/17
patrol [2]  18/12 52/13
patrolling [1]  50/25
pattern [4]  28/20 32/24 33/9 33/10
pause [2]  27/15 48/19
paycheck [1]  20/2
PDF [1]  1/1
Peachtree [2]  2/4 2/7
penalized [2]  14/4 14/5
people [21]  6/14 14/6 14/19 16/7
17/5 17/6 19/5 21/1 22/6 22/8 22/18
26/5 26/6 32/14 32/16 33/15 33/25
35/18 36/11 36/16 50/1
peril [3]  34/25 35/22 35/24
period [6]  1/3 26/12 29/24 31/19
36/21 39/9
permission [1]  23/12
permits [1]  33/2
permitted [1]  28/18
persistence [1]  24/16
person [7]  14/6 26/19 31/16 33/3
34/23 35/11 37/11
personal [3]  4/7 8/5 9/5
personnel [1]  24/23
pertains [1]  21/5
Ph.D [1]  37/24
Phillips [2]  12/19 34/6
phonetic [1]  24/23
photo [1]  26/3
piece [2]  22/24 54/17
Pines [21]  11/15 13/1 13/3 13/4 13/9
24/3 25/5 25/13 26/20 26/21 28/12
29/24 29/25 30/1 30/5 30/6 30/6 34/5
35/24 44/14 44/16
Pines' [4]  26/16 36/2 36/4 44/21
pivot [1]  39/2
place [5]  8/11 8/13 8/14 8/21 32/6
plain [3]  27/13 29/5 40/14
plaintiff [15]  1/5 2/2 4/9 10/3 13/22
26/17 26/18 26/19 26/21 27/10 28/3
29/8 33/7 42/1 45/10
plaintiff's [1]  27/11
plaintiffs [35]  3/15 3/18 4/20 4/22
5/11 7/7 7/22 10/20 10/25 11/18
11/23 14/8 16/23 18/23 19/11 22/7
23/19 23/22 26/17 27/7 29/13 29/16

## P

plaintiffs... [13] 29/24 29/25 30/4 30/16 30/19 31/17 32/1 32/10 35/15 36/2 38/11 40/21 45/19
plaintiffs' [3] 28/12 40/24 53/13
plan [17] 17/15 17/24 18/11 19/16 19/17 20/11 22/17 37/18 38/2 38/6 39/1 48/22 49/19 50/13 50/15 50/24 50/24
play [1] 26/4
Plaza [6] 21/1 41/6 41/12 49/18 50/20 51/2
plenty [2] 13/13 13/13
plug [1] 46/20
plus [3] 21/1 21/2 21/2
podium [1] 48/18
point [8] 22/16 28/7 28/17 29/15 38/9 42/5 42/24 52/23
points [3] 23/14 23/21 43/11
police [9] 12/4 14/3 15/15 17/22 19/4 19/7 20/23 21/3 49/24
pool [3] 25/10 25/10 25/12
position [20] 4/19 4/22 5/11 5/16 6/2 6/11 7/23 8/4 11/21 13/17 14/7 16/17 27/20 27/22 36/17 36/20 42/12 48/2 48/4 53/8
post [1] 41/20
power [2] 49/24 49/25
PowerPoint [1] 23/13
practice [3] 28/19 33/18 38/6
preceding [1] 24/7
predate [1] 53/11
predictable [1] 24/14
premises [7] 5/19 8/21 11/24 19/13 22/5 22/5 44/22
prepared [2] 29/11 54/12
presence [1] 24/24
presentation [1] 24/1
preserve [1] 44/12
presiding [1] 3/9
prevent [5] 20/18 34/23 36/18 40/18 50/9
preventability [5] 17/23 18/21 21/22 22/23 54/6
preventable [2] 17/14 20/15
prevented [5] 18/18 19/14 20/20 21/7 50/7
Preventing [1] 35/10
primary [10] 24/4 25/16 26/11 35/19 35/20 36/11 36/21 40/8 40/20 46/22
principle [1] 34/21
prison [1] 6/10
private [2] 19/9 50/3
proactive [1] 14/1
problem [18] 24/2 24/4 24/20 25/15 25/16 26/11 31/15 35/19 35/20 36/11 36/21 39/13 40/8 40/20 42/10 42/17 46/8 46/22
procedure [1] 6/20
proceed [1] 4/4
proceedings [6] 1/13 1/18 55/1 56/8 56/10 56/13
process [2] 46/17 50/21
prohibited [2] 1/7 31/21

proof [3] 9/17 20/17 36/9
properly [1] 38/4
property [34] 5/25 6/6 6/14 6/16 6/22 7/8 7/8 7/14 7/17 9/9 14/1 18/7 18/24 18/25 19/1 19/2 19/9 19/9 20/16 20/19 20/19 21/20 26/20 33/3 36/3 36/4 36/6 38/23 38/23 38/24 38/25 42/21 44/18 46/21
proposal [2] 41/16 46/18
proposals [3] 41/5 42/13 50/20
proprietor [1] 29/7
protests [5] 18/2 20/5 41/22 49/2 51/11
proved [1] 20/21
provider [2] 41/15 42/7
providers [1] 42/2
provisions [3] 7/9 7/18 35/10
proximate [12] 21/13 21/13 29/4 35/7 40/12 40/16 42/6 42/18 49/16 50/4 50/8 52/14
proximately [1] 40/20
public [2] 36/1 44/20
punitive [2] 45/25 47/2
punitives [1] 48/21
purely [1] 8/5
purposes [5] 10/5 10/8 14/20 22/10 33/4
pursuant [1] 33/22
pursue [1] 39/7

## Q

question [29] 4/21 4/21 5/5 10/9 14/18 28/14 28/19 28/23 29/3 29/4 29/6 29/13 30/4 32/3 32/12 32/15 32/19 34/10 34/11 35/3 39/25 40/13 43/5 43/8 46/25 47/15 47/18 48/25 52/21
questions [21] 4/11 4/15 4/18 14/13 23/4 23/8 23/14 23/23 23/25 28/11 30/12 32/1 43/12 44/15 45/23 47/4 52/24 52/25 53/3 53/6 54/18
quote [4] 24/14 29/7 33/18 43/16
quoting [1] 29/8

## R

radius [1] 11/19
raise [1] 10/7
raised [4] 23/21 28/5 30/14 50/10
random [6] 15/14 15/22 16/3 17/9 20/3 43/15
randomly [1] 20/19
range [3] 34/25 35/19 37/16
rates [1] 37/15
rational [2] 29/1 40/1
Rayshard [1] 49/3 51/12
ready [2] 13/11 38/20
recite [1] 27/25
recognition [1] 46/9
recognize [3] 30/7 34/17 47/21
record [13] 6/18 25/19 26/19 32/13 35/11 35/17 40/3 40/22 40/23 44/7 45/19 52/9 56/13
recorded [1] 1/18
recreate [1] 27/6
redacted [1] 31/16

reduce [1] 14/2
reduced [1] 56/11
references [1] 33/13
referencing [1] 1/5
regular [1] 37/15
regularly [2] 32/14 33/24
reiterated [1] 34/21
relative [2] 29/7 29/9 43/2
remain [1] 47/20
remind [1] 36/15
rental [1] 31/18
rep [2] 24/11 41/4
replace [1] 41/7
replacement [2] 41/23 41/25
reply [6] 23/21 30/14 31/9 31/11 33/7 39/11
report [1] 19/5
Reporter [5] 1/3 1/6 1/20 56/4 56/19
REPORTERS [1] 55/4
reports [1] 51/5
representation [1] 37/21
requests [3] 42/13 46/17 50/19
required [5] 20/17 20/18 20/25 21/14 38/15
resident [1] 11/15
residential [1] 8/12
resources [2] 18/3 19/22
respectfully [1] 52/15
response [2] 30/24 53/8
restaurant [14] 25/21 26/4 26/13 26/24 32/14 32/16 33/6 33/24 35/13 36/13 36/18 37/3 40/7 42/22
restricted [1] 1/3
retained [1] 27/3
revealed [1] 34/2
REYNOLDS [2] 2/6 2/7
Ricky [1] 34/6
rid [1] 36/19
rights [2] 9/8 9/11
rise [5] 3/6 33/19 40/6 44/19 54/25
risk [2] 14/24 36/10
RMR [2] 1/19 56/18
road [5] 2/7 17/7 19/3 36/1 50/1
robberies [1] 35/3
robbery [1] 35/7
Robinson [1] 46/21
Rod [1] 25/22
role [1] 41/13
room [4] 33/15 33/20 33/21 33/22
Rosebud [1] 38/12
route [1] 25/7
roving [4] 17/25 18/8 18/12 52/13
Royale [1] 24/23
rule [3] 30/22 43/22 53/22
rules [5] 5/21 31/2 31/21 36/15 42/21

## S

safe [1] 38/25
sake [2] 29/19 31/24
sat [1] 43/12
scattered [1] 7/25
scenario [2] 11/9 39/4
scope [3] 28/14 30/8 30/11
screen [1] 30/2
seat [1] 23/5

**S**

**second [4]** 15/20 17/4 18/12 48/17
**seconds [2]** 13/11 16/6
**secret [1]** 26/15
**secure [1]** 38/25
**security [62]**
**select [1]** 27/22
**selects [1]** 27/18
**seriously [1]** 47/25
**served [1]** 6/9
**services [3]** 41/8 41/14 42/3
**session [2]** 3/1 3/8
**setting [3]** 19/23 21/20 34/10
**seven [5]** 6/3 18/10 19/19 24/5 40/8
**share [3]** 8/19 8/19 8/20
**shared [2]** 8/15 8/16
**shift [4]** 17/17 18/1 18/4 51/20
**shifts [3]** 48/23 49/21 49/24
**shoot [1]** 22/8
**shooters [1]** 19/2
**shooting [33]** 8/14 11/3 12/2 15/3
  15/8 15/21 16/6 16/7 16/10 16/13
  16/20 16/25 17/4 18/19 19/6 20/19
  21/6 28/15 35/25 36/3 38/13 39/20
  39/23 43/10 43/21 44/5 44/5 44/13
  44/20 49/8 50/7 52/14 54/2
**shootings [18]** 10/10 11/20 13/9
  14/25 15/6 15/13 15/17 18/16 18/21
  21/15 24/6 24/12 24/14 35/21 37/7
  40/8 40/9 43/14
**short [2]** 45/3 47/20
**shortage [4]** 25/6 26/9 46/8 46/10
**shortages [1]** 37/14
**shortfall [1]** 46/20
**shot [12]** 11/2 12/3 13/10 15/4 16/25
  17/5 27/1 30/1 36/2 36/4 40/21 54/2
**shown [2]** 20/13 42/7
**shrinking [1]** 25/12
**side [1]** 13/15
**sidewalk [3]** 17/22 17/22 18/25
**sidewalks [3]** 8/2 17/20 50/1
**sign [2]** 31/10 50/11
**signage [2]** 31/5 37/2
**signed [1]** 31/7
**signs [2]** 7/8 9/23
**similarity [2]** 8/22 15/11
**Sims [10]** 8/23 9/1 11/2 11/2 15/3
  16/25 48/1 48/5 54/1 54/2
**Sims' [1]** 48/7
**Sims's [2]** 36/1 54/7
**single [4]** 14/8 14/9 18/5 51/4
**sister [2]** 13/2 13/4
**site [2]** 21/18 41/8
**situation [4]** 40/5 40/11 49/5 52/14
**situations [2]** 21/17 33/1
**six-second [1]** 15/20
**slip [1]** 11/6
**slot [3]** 19/18 20/1 52/19
**slots [3]** 19/24 20/3 52/6
**Smith [1]** 33/11
**so-called [1]** 32/4
**socialized [1]** 26/25
**sole [1]** 25/4
**solid [1]** 31/23

**soon [1]** 54/19
**source [1]** 25/4
**space [2]** 25/20 36/12
**specific [5]** 17/1 17/3 17/3 24/20
  54/12
**speculate [2]** 18/11 52/18
**speculation [2]** 18/15 22/22
**speed [1]** 17/8
**spent [5]** 10/23 10/23 11/13 11/16
  12/19
**spills [1]** 25/9
**split [1]** 4/14
**spoliated [1]** 27/5
**spoliation [1]** 44/8
**spring [2]** 25/24 26/10
**staff [4]** 37/1 37/11 37/15 38/20
**staffing [4]** 24/22 37/13 42/14 51/25
**stage [1]** 28/9
**stand [1]** 40/2
**standard [9]** 15/11 21/11 23/2 27/8
  27/24 27/25 39/22 43/25 46/5
**standards [1]** 34/18
**standing [3]** 7/16 7/18 45/16
**standpoint [1]** 27/19
**starting [1]** 46/6
**state [3]** 39/12 39/12 41/20
**statement [3]** 13/20 30/24 31/1
**states [4]** 1/1 3/7 39/14 56/5
**station [2]** 12/4 38/13
**status [6]** 10/2 28/13 29/22 30/11
  38/11 54/7
**statuses [1]** 28/12
**statutes [1]** 5/21
**steal [1]** 17/7
**Stenograph [1]** 56/7
**stenography [1]** 1/18
**Stephanie [4]** 26/1 26/3 26/13 33/23
**steps [1]** 40/17
**stood [2]** 15/24 15/25
**stopped [1]** 19/3
**story [2]** 26/18 45/10
**straightforward [1]** 35/17
**street [7]** 2/4 2/11 17/21 18/25 19/7
  19/13 22/6
**streets [5]** 8/2 17/19 17/21 17/22
  19/10
**strongly [1]** 48/8
**structure [1]** 53/3
**substantial [2]** 15/11 40/3
**successfully [1]** 11/8
**sudden [3]** 15/22 43/15 44/9
**suggestion [1]** 47/6
**Suite [3]** 2/4 2/8 2/12
**summary [14]** 14/20 21/9 21/25
  22/14 27/8 27/13 27/21 27/23 28/6
  28/8 30/12 52/22 53/1 53/3
**summer [2]** 25/24 26/10
**superior [8]** 10/19 13/17 29/6 42/25
  43/2 43/4 43/6 45/1
**supplement [1]** 41/24
**supply [1]** 46/10
**support [3]** 10/1 27/20 27/22
**supported [1]** 6/18
**supporting [1]** 43/3
**supports [2]** 11/21 37/19

**Supreme [7]** 27/12 28/22 29/1 39/17
  40/13 43/1 43/20
**surpassed [2]** 24/15 24/17
**surrounded [1]** 17/20
**survives [1]** 54/15
**SW [1]** 1/21
**swear [1]** 53/11
**swing [1]** 26/24
**switch [1]** 13/15

**T**

**tall [1]** 20/18
**tangentially [1]** 31/4
**target [2]** 10/4 15/24
**targeted [1]** 14/20
**targeting [1]** 14/23
**targets [1]** 17/12
**Tate [1]** 24/8
**taxi [2]** 35/1 35/5
**Teachey [1]** 25/23
**Ted [1]** 1/21
**tenant [4]** 9/17 9/18 9/19 26/20
**tenants [16]** 6/13 9/6 9/10 9/24 26/16
  29/23 30/6 30/9 30/17 30/18 31/6
  31/10 31/12 31/17 31/22 51/6
**tenants' [1]** 7/10
**terms [1]** 46/16
**terrorism [1]** 17/10
**testimony [11]** 7/16 8/24 9/1 12/7
  12/10 25/7 25/22 25/25 26/1 27/6
  41/24
**thank [14]** 3/23 10/17 14/16 14/17
  23/7 23/9 23/17 48/14 48/15 54/16
  54/21 54/22 54/23 54/24
**therefrom [1]** 27/11
**third-party [1]** 11/9
**THOMAS [1]** 2/6
**thread [2]** 28/8 28/10
**thrown [1]** 6/8
**tie [1]** 21/3
**tied [1]** 40/18
**time [27]** 6/10 8/14 9/5 9/17 9/18 9/19
  10/23 11/3 11/11 11/11 11/17 12/12
  12/19 15/7 17/5 20/22 22/16 23/20
  31/19 32/7 34/7 42/23 46/17 46/19
  51/2 53/12 53/13
**times [3]** 6/16 24/7 47/22
**timing [2]** 17/8 48/25
**Tommaneka [1]** 8/24
**totality [11]** 15/11 15/16 16/9 39/18
  39/22 40/4 43/18 43/23 43/24 49/12
  49/14
**touch [4]** 28/6 42/24 44/23 48/20
**towards [2]** 24/10 35/22
**Tower [1]** 2/4
**transcript [7]** 1/1 1/4 1/7 1/8 1/13
  1/18 56/12
**transcripts [1]** 1/2
**translated [1]** 46/9
**transpired [1]** 44/18
**traverse [1]** 7/19
**traversed [1]** 11/7
**traversing [1]** 9/7
**trespass [8]** 5/19 6/1 6/2 6/3 6/12
  6/22 6/24 6/25

## T

**trespassed [2]** 5/25 6/6
**trespasser [5]** 5/20 5/23 6/4 10/2 54/8
**trespassers [12]** 4/20 5/7 5/12 5/14 5/15 5/17 7/3 7/5 21/21 23/1 29/19 34/16
**trespassing [3]** 5/17 6/5 7/2
**trial [3]** 30/8 48/2 53/16
**trials [1]** 48/3
**trigger [2]** 32/20 34/14
**Tuesday [1]** 2/15
**Turner [1]** 1/21
**typewritten [1]** 56/11

## U

**U.S [2]** 1/20 37/23
**ultimate [1]** 35/7
**ultimately [2]** 8/7 9/2
**uncomfortable [1]** 47/7
**undeniably [2]** 29/4 40/13
**undesirable [2]** 6/15 6/17
**undesirables [1]** 6/20
**undisputable [1]** 27/13
**undisputed [18]** 9/16 9/20 9/20 9/22 9/23 9/25 10/2 19/1 20/8 29/5 29/24 30/1 30/2 30/24 40/14 52/7 52/16 52/22
**unforeseeable [1]** 16/18
**unidentified [1]** 31/16
**unique [7]** 7/24 16/9 21/15 26/18 26/18 45/13 52/13
**unit [3]** 7/20 9/3 9/7
**UNITED [3]** 1/1 3/7 56/5
**units [1]** 17/17
**unless [7]** 16/19 29/1 29/5 39/25 40/14 43/12 49/16
**unsigned [3]** 31/9 31/12 31/25
**unsuccessfully [1]** 11/8
**unto [1]** 42/11
**unusual [1]** 32/7
**updates [1]** 14/9
**us [10]** 4/11 27/6 38/19 44/10 49/23 50/21 51/5 52/5 52/6 52/23
**usage [1]** 28/18

## V

**vacation [1]** 51/24
**vacuum [1]** 49/7
**valid [1]** 31/25
**van [1]** 26/4
**veer [1]** 43/20
**vehicles [2]** 24/9 44/14
**vendor [1]** 39/4
**vendors [1]** 42/15
**verdict [1]** 48/7
**versus [2]** 10/4 21/21
**vicinity [1]** 44/14
**VICTORIA [2]** 1/12 3/9
**video [7]** 7/13 9/17 19/1 44/6 44/8 44/11 44/12
**Villa [1]** 24/22
**violence [5]** 12/17 12/24 15/22 19/8 24/17
**violent [4]** 10/21 14/24 24/5 35/21

**visit [6]** 9/7 26/17 26/20 26/21 29/24 30/16
**visited [1]** 29/25
**visiting [4]** 8/5 9/17 9/18 34/6
**visitor [1]** 30/11
**visits [1]** 26/22
**VMC [3]** 1/6 1/7 56/10
**void [2]** 46/20 46/22
**volatile [2]** 40/5 40/10
**volume [1]** 24/16

## W

**waived [1]** 30/25
**Wal [2]** 28/16 43/9
**Wal-Mart [2]** 28/16 43/9
**walk [1]** 35/9
**walked [1]** 50/21
**walking [3]** 7/14 7/15 9/20
**walkways [2]** 7/19 8/20
**walls [2]** 20/18 36/8
**wanton [2]** 23/1 34/22
**warn [5]** 35/14 38/16 42/22 46/23 47/2
**warned [1]** 45/17
**warning [6]** 6/22 6/25 6/25 37/12 44/1 44/3
**warnings [2]** 6/12 35/15
**warrant [1]** 32/8
**we'd [4]** 4/12 48/12 53/24 54/14
**weekly [2]** 14/9 52/5
**Whereas [1]** 48/11
**who's [2]** 37/23 37/24
**willful [2]** 23/1 34/22
**willfully [1]** 51/8
**Wiltse [3]** 28/15 30/13 40/15
**window [2]** 17/5 46/11
**windows [1]** 36/9
**WINGATE [63]**
**Wingate's [12]** 13/17 24/11 24/13 24/14 25/7 25/22 31/20 32/5 38/23 40/19 42/6 46/9
**withdrawn [1]** 52/11
**WOODRICK [7]** 2/9 3/25 4/13 4/16 5/5 15/4 54/11
**Woodrick's [1]** 27/16
**Woods [1]** 8/24
**Woods' [1]** 9/2
**worry [1]** 39/13
**worse [1]** 25/19
**worth [1]** 32/10
**WYNETTE [3]** 1/19 56/4 56/18

## Y

**yard [1]** 45/16
**young [1]** 45/12

## Z

**Zaxby's [2]** 8/7 8/8
**zero [4]** 19/10 19/25 19/25 21/6